STATE of Iowa, Appellee,

v.

Evelyn Lou TANGIE, Appellant.

No. 98–0896.

Supreme Court of Iowa.

Sept. 7, 2000.

---

R.E. Breckenridge of Johnson, Hester, Walter & Breckenridge, L.L.P., Ottumwa, for appellant.

Thomas J. Miller, Attorney General, Karen Doland and Douglas D. Hammerand, Assistant Attorneys General, Victoria Siegel, County Attorney, and Ronald Kelly, Assistant County Attorney, for appellee.

LARSON, Justice.

Evelyn Lou Tangie was convicted by a jury of second-degree murder in violation of Iowa Code section 707.3 (1997). The court of appeals reversed, and we granted the State's application for further review. We vacate the decision of the court of appeals and affirm the judgment of the district court.

## I.  *Facts and Prior Proceedings.*

The body of the defendant's former boyfriend, John Terry, was discovered in rural Wapello County. The cause of death was a blow to the head with a blunt object. A pickax handle with Terry's blood on it was found nearby.

Investigating officers contacted Tangie, who soon became entangled in conflicting stories about her knowledge of Terry's death. She first said the victim had left her house, intoxicated, on the night he disappeared, and she never saw him again. She did not mention being at the murder scene. Later, she told a different version of events. She told officers Terry was rough to her and on numerous occasions she had unsuccessfully asked Terry to move out of her house. Terry kept going to her for money, according to her. Tangie told the officers she had gone with Terry and Ben Schreiber to see a mobile home on the night of the murder. Schreiber drove the car, the victim sat in the front seat, and the defendant sat in the back, according to her. When they got to the mobile home, she and the victim walked, holding hands, toward the mobile home. Schreiber was behind them. She heard some thuds, and Terry fell to the ground. Tangie told officers she did not see the pickax handle Schreiber used until he later put it in the backseat of his car. She told officers that Schreiber threw the handle out the window and told her she was "just as involved" as he was, and she had better not tell anyone about it. Tangie said she and Schreiber went to a friend's house so they could get their story

straight for the police. She told officers Schreiber burned the clothes he was wearing, and she threw hers into a trash bin at work.

Tangie was charged with first-degree murder. She gave notice of her intent to call Schreiber as a witness, but he invoked his Fifth Amendment privilege against self-incrimination. Tangie filed a motion in limine to prohibit the State's use of evidence regarding statements attributed to Schreiber. She claimed such evidence would be hearsay and would violate her Sixth Amendment right to confront the witnesses against her.

## II. *Issues on Appeal.*

The defendant raises five issues: (1) the admission of statements made by Schreiber, (2) the court's denial of her right to obtain evidence under *Brady v. Maryland* and the opportunity to impeach a State witness based on that evidence, (3) the court's refusal to allow her to depose a State rebuttal witness, (4) the court's instruction regarding inferred intent, and (5) the sufficiency of the evidence.

## III. *The Statement by the Alleged Coconspirator.*

The defendant contends evidence of statements made by Schreiber was hearsay and violated her right of confrontation. The gist of Schreiber's statements, which came in through the testimony of a Charles Denham, was that Schreiber (who was also charged with the murder) had told Denham that he and the defendant were going to get the victim drunk and "drop him off" in Des Moines. Schreiber asked Denham, his employer, for money to buy gas.

■ We review the admission of hearsay evidence for errors at law. *State v. Moeller,* 589 N.W.2d 53, 54 (Iowa 1999). We review claims under the Confrontation Clause de novo. *State v. Jefferson,* 574 N.W.2d 268, 271 (Iowa 1997).

■ A. *Preservation of error.* At the outset, we must determine whether Tangie has preserved error with respect to the hearsay and Confrontation Clause issues. Prior to trial, Tangie filed a motion in limine to prevent Denham's testimony. The motion asserted both hearsay and Confrontation Clause arguments, but the court did not rule on the motion prior to trial. At trial the defendant pressed for a ruling on her hearsay objection, but she did not raise a Confrontation Clause argument. In response to the State's argument that the evidence should be admitted under Iowa Rule of Evidence 801(d)(2)(E), the court made it clear it would wait until the evidence was proffered before it ruled on the objection, saying "[w]e'll cross that bridge when we get there, counsel." Defense counsel then asked to make an offer of proof, and the court responded as follows:

> THE COURT: Counsel, I have no idea as to what context this is going to be brought up in. You can forewarn me prior to the time that it starts to come up, and we'll take a look at it then.

■ Later, during the State's examination of Denham, defense counsel asked that a hearing be held in the absence of the jury to allow the court to hear the evidence in question. The court granted the request. In that hearing, Denham related the conversation with Schreiber concerning the plan to get the victim drunk and drop him off in Des Moines. The defendant's lawyer then renewed the hearsay objection, and the court said it "finds that the statements are admissible under [Iowa Rule of Evidence] 801(d)(2)." The Confrontation Clause was not raised in this hearing. In fact, the only time it was ever mentioned was in the defendant's written motion in limine. Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial. *State v. Edgerly,* 571 N.W.2d 25, 29 (Iowa App.1997) (citing *State v. Davis,* 240 N.W.2d 662, 663 (Iowa 1976)). However,

where a motion in limine is resolved in such a way it is beyond question whether or not the challenged evidence will be admitted during trial, there is no reason to voice objection at such time during trial. In such a situation, the decision on the motion has the effect of a ruling.

*State v. Miller,* 229 N.W.2d 762, 768 (Iowa 1975). This rule is inapplicable in this case because the court did not, in addressing the motion in limine, "resolve[ ] [the issue] in such a way it is beyond question whether or not the challenged evidence will be admitted during trial...." *Id.* In fact, the court made it clear it would not rule on the hearsay objection until the evidence was offered at trial, and it gave no indication at all how it would rule on a Confrontation Clause argument had the argument been presented to it. We conclude the defendant has failed to preserve a Confrontation Clause argument and has therefore waived it.

■ It is likely defense counsel did not press the Confrontation Clause issue because, as the State argues, there is no merit in the argument in any event. Our court of appeals, in reversing on the Confrontation Clause issue, relied on the Supreme Court cases of *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), both of which must be distinguished. These cases involved confessions by nontestifying codefendants who stood to gain by implicating the defendant. In the present case, the evidence was not admitted as a confession by a codefendant but as a statement by a codefendant in furtherance of a conspiracy under Iowa Rule of Evidence 801(d)(2)(E). The identical federal rule of evidence, according to the Supreme Court, is so firmly established there is no need for a separate Confrontation Clause analysis. According to the Court, [w]e think that [prior Supreme Court] cases demonstrate that co-conspirators' statements, when made in the course and in furtherance of the conspiracy, have a long tradition of being outside the compass of the general hearsay exclusion. Accordingly, we hold that the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E).

*Bourjaily v. United States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144, 158 (1987).

■ B. *Merits of arguments.* For the reasons just discussed, we reject Tangie's Confrontation Clause argument and proceed to the hearsay issue. The district court allowed evidence of Schreiber's out-of-court statement under the coconspirator exception of Iowa Rule of Evidence 801(d)(2)(E), which provides a statement is not hearsay if "[t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Tangie argues the district court erred in admitting the evidence under this rule because the State failed to prove the existence of a conspiracy and failed to show the statement was made during and in furtherance of a conspiracy.

■ Under rule 801(d)(2)(E), statements by a coconspirator are admissible against the party as an admission of a party-opponent. *State v. Ross,* 573 N.W.2d 906, 914 (Iowa 1998). Before the statement is admissible, the court must find, by a preponderance of the evidence, that a conspiracy to commit a crime existed between the declarant and the nonoffering party. *In re Property Seized from DeCamp,* 511 N.W.2d 616, 621 (Iowa 1994). Such a finding is implicit when the district court admits the statement into evidence. *State v. Florie,* 411 N.W.2d 689, 695 (Iowa 1987). We review a district court's determination that a conspiracy existed under the substantial-evidence test. *Id.*

The defendant contends the foundation for admitting evidence under rule 801(d)(2)(E) must be established by evi-

dence independent of the out-of-court statement itself. Otherwise, admitting an out-of-court statement that is supported only by the statement itself has been characterized as impermissible "bootstrapping." *See Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680, 701–02 (1942). However, the *Glasser* rule has been effectively superseded by Congress through its adoption of the Federal Rules of Evidence. *See Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781, 97 L.Ed.2d at 156. Federal Rule of Evidence 104(a), similar to our rule of the same number, provides:

> Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Federal Rule of Evidence 1101(d)(1), which is similar to our rule 1101(c)(1), states that the rules of evidence, except those involving privileges, shall not apply to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104."

Under the federal rules, "there is little doubt" a court may consider the out-of-court statement itself to establish the foundational facts to apply the coconspirator exception under Federal Rule of Evidence 801(d)(2)(E). *Bourjaily*, 483 U.S. at 180, 107 S.Ct. at 2781, 97 L.Ed.2d at 156. We believe a similar approach is appropriate under Iowa Rules of Evidence 104(a) and 1101(c)(1). We hold decisions on admissibility made pursuant to Iowa Rule of Evidence 104(a) may be made by the court without respect to the rules of evidence, including those concerning hearsay. *See Florie*, 411 N.W.2d at 695–96.

The statement attributed to Schreiber as a coconspirator was presented to the court in its *in camera* hearing:

> Q. When you were talking to Mr. Schreiber, did he talk about a plan? A. Yes.

> Q. Tell the jury what happened. A. Benny [Schreiber] had mentioned that— talking about this relationship with Evelyn [Tangie] and mentioned—there was only one problem and that she'd had a boyfriend. And I had replied, one problem, she's got a boyfriend? And he says, I hear he's a real asshole. I never knew the guy. And I replied, well, good, hopefully he'll kick your ass and I can get some work out of you again. Then later on Benny mentioned, well, the plan is that them or Mary and Evelyn are to take him out and get him drunk tonight and I'm going to drive him and drop him off in Des Moines.

> Q. And after that conversation after Mr. Schreiber told you that, was there any talk about gas money? A. Yes.

> Q. Tell us about that. A. Benny had asked for some money for some gas so I wrote him out a check for $15, I believe.

> Q. Did you write the check out to him personally? A. No. I wrote it out to Amoco.

> Q. So when Mr. Schreiber told you the plan was to get—Mary and Evelyn were to get—John Terry drunk and go drop him off, did he say where? A. He said Des Moines.

The court in *Bourjaily* found it unnecessary to decide whether a court may rely solely on hearsay statements to find the existence of a conspiracy because in that case the statements of the coconspirator regarding the existence of a conspiracy were supported by "subsequent events" tending to show the existence of a conspiracy. *Id.* at 181, 107 S.Ct. at 2781–82, 97 L.Ed.2d at 156. That is the case here; the out-of-court statement is supplemented by other evidence of the conspiracy: Denham testified he had seen Schreiber and Tangie together the Thursday or Friday before the murder (which occurred on Saturday) and that Schreiber was "awful happy" because "[h]e had met Evelyn ... and he

was all excited because of just the relationship that they were gonna have."

Mary Gerlich, a friend of Tangie, testified that on the day of the murder Tangie asked her to take her to talk to Schreiber. Gerlich said Schreiber and Tangie talked about Tangie getting a restraining order against Terry, about Tangie going to look at the bus in which Schreiber lived, and their concern about the bus being "big enough," apparently in reference to Tangie moving in with Schreiber. Gerlich also testified to driving Tangie to Schreiber's bus and to later picking up Tangie, Terry, and Tangie's son to take them to Gerlich's house. While Tangie and the victim were at Gerlich's house on the day of the murder, Schreiber arrived, and Tangie went outside to talk to him. Tangie and Schreiber later suggested they go with the victim to look at a trailer house. They left in Schreiber's car, and when they returned, the victim was not with them. Karen Brown, Schreiber's neighbor, testified Schreiber did not have a telephone and that on the day of the murder a female called for Schreiber, identifying herself as Evelyn, "Benny's [Schreiber] girlfriend." She testified the person sounded excited and panicky, making it seem urgent to get Schreiber on the line.

■ This extrinsic evidence and the alleged coconspirator's statement itself provide substantial record support for the trial court's finding of a conspiracy. Once a conspiracy is established, two conditions must be met for rule 801(d)(2)(E) to apply: the statement must have been made during the pendency of the conspiracy, and it must be in promotion of the conspiracy's object or design. *Ross,* 573 N.W.2d at 915. The evidence of the parties' activities surrounding the statement and the statement itself provide substantial support for the court's implied finding the statement was made during the pendency of the conspiracy and in furtherance of it. For example, a reasonable inference from Schreiber's statement regarding gas money is that it was needed as a part of the plan to drive the victim to Des Moines.

The court did not err in admitting Schreiber's statements under Iowa Rule of Evidence 801(d)(2)(E).

### IV. *Impeachment of State's Witness.*

Mary Gerlich testified for the State and was cross-examined by the defendant. After she was excused, but while the trial was still in progress, the defendant discovered possible grounds for impeaching Gerlich's testimony. The defendant requested an opportunity to recall Gerlich for that purpose. The court refused, and the defendant assigns this as error.

■ A. *The* Brady *issue.* The defendant contends Gerlich had been convicted of contributing to the delinquency of a minor by having her children steal compact disks for her. The defendant says she did not know about the conviction until after Gerlich was excused as a witness, and she blames the State for that. She contends the State's failure to reveal this evidence violated the rule of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963) (suppression of material evidence favorable to accused violates due process). Moreover, she claims, the court abused its discretion in refusing her request to recall Gerlich when she discovered this information. We review the *Brady* issue de novo and the refusal to recall Gerlich for an abuse of discretion. We have said

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.

*State v. Anderson,* 410 N.W.2d 231, 232 (Iowa 1987) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218). To establish a *Brady* violation, the defendant must prove the prosecution suppressed evidence that was favorable to the defendant and material to the issue of guilt. *State v. Veal,* 564 N.W.2d 797, 810 (Iowa 1997). Evidence is material for purposes of the *Brady* rule when there is a

"reasonable probability" that disclosure would have changed the result of the proceeding. *Id.* A defendant can establish "reasonable probability" of a different result by showing that suppression undermines confidence in the outcome of the trial. *Id.*

Tangie made no showing the prosecution suppressed the existence of Gerlich's conviction. Moreover, she cannot show a reasonable probability it would have changed the result of the proceeding, *Anderson,* 410 N.W.2d at 235 (suppression of evidence concerning prior conviction standing alone will not rise to level of reasonable probability of different result), or how suppression of the conviction record would have undermined confidence in the outcome of her trial. At best, use of the impeachment evidence would establish that Gerlich was untruthful. However, Tangie's cross-examination of Gerlich quite effectively established that anyway; Gerlich admitted she had lied earlier to investigating officers. There is no reasonable probability that, had the jury learned of another act of dishonesty, this would have changed the result of the trial. Tangie has not established a *Brady* violation.

■ B. *Recalling the witness.* In a related argument, Tangie complains of the trial court's refusal to recall Gerlich so Tangie could attempt to impeach her based on her conviction. Aside from the fact Tangie could show no reasonable probability this evidence would have changed the result of the trial, she faces the fact that recalling witnesses is a matter of broad trial court discretion. *State v. Ivy,* 300 N.W.2d 310, 311 (Iowa 1981). We find no abuse here.

## V. *Deposition of State's Rebuttal Witness.*

The State called Dr. Michael Taylor, a psychiatrist, on rebuttal to testify regarding the defendant's claim, supported by expert testimony, that her low intellectual functioning would have made it difficult for her to plan the murder and difficult for her to make a timely report of the incident to the police.

■ The defendant complains about the court's refusal to allow her to take a discovery deposition of Dr. Taylor. She concedes there is no authority on the issue, but she contends the interests of justice should be sufficient. She bases this argument on Iowa Rule of Criminal Procedure 12(2)(a), which provides:

> Whenever the interests of justice and the special circumstances of a case make necessary the taking of the testimony of a prospective witness not included in subsection 1 [deposition by defendant of witnesses listed on indictment or information] or 3 [deposition by State of witnesses listed by defendant] of this rule, for use at trial, the court may upon motion of a party and notice to the other parties order that the testimony of the witness be taken by deposition and that any designated book, paper, document, record, recording, or other material, not privileged, be produced at the same time and place. For purposes of this subsection, special circumstances shall be deemed to exist and the court shall order that depositions be taken only upon a showing of necessity arising from either of the following:
>
> (1) The information sought by way of deposition cannot adequately be obtained by a bill of particulars or voluntary statements.
>
> (2) Other just cause necessitating the taking of the deposition.

The issue of whether rule 12(2)(a) provides authority for pretrial deposition of a witness was resolved against Tangie's argument in a case decided after the trial in this case. *See State v. Weaver,* 608 N.W.2d 797, 800–02 (Iowa 2000) (rule 12(2) to be used only to perpetuate testimony for trial, not for discovery).

Because rule 12(2) is the only basis on which discovery may be ordered on "special circumstance" grounds, and that rule

is inapplicable here, we reject this argument.

## VI. *The Court's Instructions.*

The court's marshaling instruction, No. 20, stated:

In order to prove the defendant guilty of Murder in the Second Degree, as a lesser included offense of the crime charged in the Trial Information, the State must prove all of the following elements:

1. On or about July 27, 1996, someone aided and abetted by the defendant struck John Terry.

2. John Terry died as a result of being struck.

3. The defendant acted with malice aforethought, or someone aided and abetted by the defendant acted with malice aforethought, with the knowledge of the defendant.

If the State has proved all of the elements, the defendant is guilty of Murder in the Second Degree. If the State has failed to prove any one of the elements, the defendant is not guilty of Murder in the Second Degree, and you will then consider the charge of Involuntary Manslaughter, as explained in Instruction No. 21.

Tangie argues this instruction was wrong because "the jury was permitted to infer such specific [ ] state of mind for Evelyn if they concluded that Ben Schreiber possessed that state of mind ... [and allowed the jury] to presume Evelyn had malice aforethought because of Ben Schreiber's use of a dangerous weapon."

■ We reject both criticisms of the court's instructions. When intent is an element of the crime charged, a person may be convicted as an aider and abettor by participating either with the requisite intent or with the knowledge that the principal possesses the required intent. *See State v. Lewis,* 514 N.W.2d 63, 66 (Iowa 1994); *State v. Lott,* 255 N.W.2d 105, 109 (Iowa 1977); *State v. Speaks,* 576 N.W.2d 629, 632 (Iowa App.1998). This was the gist of instruction 20, which correctly stated the law.

■ We also reject Tangie's argument that the instructions would allow the jury to infer she had malice aforethought from Schreiber's use of a dangerous weapon. The court defined malice aforethought in instruction 15:

Murder in the First Degree and Murder in the Second Degree both require "malice aforethought."

"Malice" is a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.

"Malice aforethought" is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time.

The court then stated in instruction 17 that:

If a person has the opportunity to deliberate and uses a dangerous weapon against another resulting in death, you may, but are not required to, infer that the weapon was used with malice, premeditation and specific intent to kill.

There was substantial evidence to find this defendant knew Schreiber had the ax handle and intended to use it. This instruction correctly allowed the jury to find the requisite malice on the part of Tangie as an aider and abettor.

## VII. *Sufficiency of the Evidence.*

To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission. *Jefferson,* 574 N.W.2d at 277. The State must prove the accused knew of the crime at the time of or before its commission. However, such proof need not be established by direct proof, it may be either direct or circumstantial. *Lewis,* 514 N.W.2d at 66.

Neither knowledge of the crime nor proximity to the crime scene are enough to prove aiding and abetting. *Id.* However, they are factors, which with circumstantial evidence such as "presence, companionship, and conduct before and after the offense is committed," may be enough to infer a defendant's participation in the crime. *Id.* (quoting *State v. Miles,* 346 N.W.2d 517, 520 (Iowa 1984)). When, as here, intent is an element of the crime charged, a person may be convicted on a theory of aiding and abetting if she participates with either the requisite intent, or with knowledge the principal possesses the required intent. *Lewis,* 514 N.W.2d at 66; *Lott,* 255 N.W.2d at 109; *Speaks,* 576 N.W.2d at 632.

Tangie argues there was not sufficient evidence to convict her as an aider and abettor and the court should have directed a verdict in her favor. In resolving the issue of whether substantial evidence supports the verdict, we view the evidence in the light most favorable to the verdict. *State v. Rohm,* 609 N.W.2d 504, 509 (Iowa 2000).

Tangie does not contest the fact that Schreiber clubbed the victim to death with a pickax handle. She argues, however, there is not sufficient evidence to convict her as an aider and abettor. Also she contends "the evidence, while viewed in the light most favorable to the State, can-

not be viewed from the perspective of a normal person" because she has "special needs and conditions" and does not react as other people do.

We reject her competency argument, for which she cites no authority, because there was substantial evidence her lack of mental capacity had nothing to do with her involvement in the crime or her failure to report it, as she claims.

The jury could reasonably infer she was, in fact, the instigator of the murder. She had an unpleasant relationship with the victim, which she had been unable to terminate. On the other hand, Schreiber did not even know the victim. Tangie had said previously she wished the victim were dead.

Tangie and Schreiber were involved in a flurry of activity just before the killing. On the day of the murder, a female, identifying herself as "Benny's girlfriend," and as Evelyn, called for him at Karen Brown's house (Schreiber didn't have a telephone, so he took calls at Brown's). The voice on the telephone sounded excited and panicky, making it seem urgent that she speak with Schreiber. This same person called later that day, again identifying herself as Evelyn and asking for Schreiber; he took that call and immediately left in his car.

Cemeron Babcock, a friend of Schreiber, testified that on the day of the murder he was in Schreiber's car and noticed an ax handle on the back floorboard of Schreiber's car, which he placed in the back window. Tangie later sat in the backseat when she, Schreiber, and Terry went to see the trailer. The jury could reasonably infer she saw the ax handle at that time.

Schreiber told Charles Denham that the victim was an impediment to Schreiber's relationship with Tangie. The jury could find that Tangie helped get the victim drunk and lured him to the scene where he was murdered. Tangie also made an incriminating statement to a witness concerning bloody shoes she had thrown into the trash and "kinda laughed" about it

because the officers had taken the wrong shoes for examination.

We conclude there was substantial evidence for the jury to find that this defendant was guilty of murder in the second degree as an aider and abettor. Accordingly, we vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except NEUMAN, J., who takes no part.