# IN THE COURT OF APPEALS OF IOWA

No. 15-1078
Filed December 21, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JAYDEN RAY CHAPMAN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.


        Jayden Chapman appeals his convictions following a jury trial for two counts of first-degree murder and one count of reckless use of fire.  **AFFIRMED.**


        Zachary S. Hindman of Mayne, Arneson, Hindman, Hisey & Daane, Sioux City, for appellant.

        Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.


        Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**DANILSON, Chief Judge.**

Jayden Chapman appeals his convictions following a jury trial for two counts of first-degree murder, in violation of Iowa Code section 707.2 (2013), in the deaths of Marvin Huelsing and Alice Huisenga, and one count of reckless use of fire, in violation of section 712.5. Chapman contends his trial counsel rendered ineffective assistance in failing to object to faulty jury instructions. Chapman also asserts the verdict is not supported by substantial evidence or, in the alternative, is contrary to the weight of the evidence. Because we find trial counsel did not render ineffective assistance, there is substantial evidence supporting Chapman's convictions, and the verdict is not contrary to the weight of the evidence, we affirm.

### I. Background Facts and Proceedings.

The facts as presented at trial reflect that in the early morning hours of March 10, 2014, Michael Schenk, Jayden Chapman, and Erika Dains met, used methamphetamine, and rode in Schenk's blue extended-cab truck to a farm belonging to Marvin Huelsing with the intent to steal scrap metal. Dains testified that while they were driving around the farm property collecting various items, including steel posts, the truck got stuck in the mud. Efforts to pull the truck out of the mud were unsuccessful, and it was beginning to become light outside. Chapman testified he noticed the cows coming toward the grain feeders and realized someone could be coming to feed them soon. Chapman testified he told Schenk "the cows are heading towards their feed bunk. They're going to need to eat soon. And I asked him, what if people come. And then that's when—that's when he made the comment that if people come, we'll kill them."

Chapman and Schenk walked up towards the area of the property where a mobile home was located to try to find something to help extract the truck from the mud. Chapman testified he and Schenk also searched the mobile home. Schenk located a .22 rifle, and Chapman located .12 gauge and .22 shells. Chapman and Schenk were still inside the mobile home when they heard a vehicle approaching. Schenk, armed with the gun, and Chapman, armed with a knife, hid in the trailer. Chapman testified he heard a man, Huelsing, state loudly that he was going to call the sheriff, and Chapman and Schenk rushed out of the mobile home toward the man and woman outside while displaying the knife and gun. The man was Marvin Huelsing, who owned the farm, and the woman was Alice Huisenga, who was a long-time friend and farming partner of Huelsing. Huisenga would accompany Huelsing to the farm several times a week to help Huelsing on the farm or have coffee in the mobile home.

Chapman testified Schenk was yelling and ordered Huelsing and Huisenga to throw their phones. Chapman testified,

> that's when I remembered that—what he said earlier and how he was acting around these people. And I remember his comment that [if] people come, we'll kill them. And so I told Michael, I said, Michael, we don't have to do what you said earlier. . . . No one has to get hurt. We can leave.

However, Schenk ordered Huelsing and Huisenga to go inside the mobile home. Upon hearing a click and believing Huelsing had locked the door to the mobile home, Schenk fired at Huelsing and shot him in the chest. Chapman and Schenk then entered the mobile home. Chapman testified Schenk handed Chapman the gun and ordered him to shoot Huisenga. Chapman pointed the gun at Huisenga and pulled the trigger. He then threw the gun back to Schenk

and ran out of the mobile home. Huelsing struggled against Schenk and the gun while the two were exiting the mobile home. Schenk broke away with the gun, and Huelsing ran in the direction of Chapman. Chapman pushed Huelsing, and Huelsing fell to the ground. According to Chapman, Schenk then shot Huelsing again in the chest area and in the head.[1]

Dains, who had remained with Schenk's truck, testified she heard a man yell, "I'm going to call the sheriff" followed by the sound of a gunshot. Dains testified she saw Chapman drive a "little truck"—later identified as belonging to Huelsing—around the side of the mobile home, stop, and get out. Dains then saw Schenk approach the small truck and put a "long" gun in the cab. Schenk then ran down to where Dains was located. Dains testified Schenk was crying and stated, "I had to shoot him. I had no choice." Chapman then drove the small truck to Dains and Schenk. Chapman told Dains, "I had to take control because [Schenk] couldn't go through with it." Dains noticed a purse in the small truck.

Schenk, Chapman, and Dains then rode in the small truck back towards the area of the property near the mobile home to again try to find something to help get Schenk's truck out of the mud. Dains saw a man lying on the ground near the mobile home "with blood bubbles coming out of his mouth." Schenk approached the man and took his wallet, ID, and cellphone. Dains testified Chapman and Schenk leaned over the body whispering. Dains also saw Chapman and Schenk break two cell phones belonging to Huelsing and Huisenga. Dains, Schenk, and Chapman then drove the small truck back down

---

[1] Chapman's statement to law enforcement indicates that he, Schenk, and Huelsing all went outside the mobile home, Chapman gave the gun back to Schenk, Huelsing ran at Chapman, Chapman pushed him to the ground, and Schenk shot Huelsing again.

near Schenk's truck and were finally able to extract Schenk's truck from the mud using chains.

Dains testified Chapman then "said that, you know, we have to get rid of the [small] truck—or get rid of it, like start it on fire or something." To which Schenk responded, "Yeah, I know." Dains testified she and Schenk then again drove in Schenk's truck up to the area of the property near the mobile home. Schenk went back down to the small truck, where Chapman had remained. Chapman testified he spray painted the knobs on a tractor to obliterate any fingerprints while Schenk lit the small truck on fire. Dains testified she did not see Chapman or Schenk set fire to the truck, but she "heard the horn going off, and it wouldn't stop going off."

Dains testified Chapman and Schenk then came back up to Schenk's truck. While Dains waited in Schenk's truck, Schenk went into the mobile home. Chapman stood outside Schenk's truck and yelled at Schenk "to hurry up, hurry up. Come on, come on." After about five or ten minutes, Schenk came out carrying gas cans and placed them in the truck near Dains, along with the gun and other items taken from Huelsing and Huisenga. After Schenk came out of the mobile home, Dains saw flames coming from the structure. Schenk, Chapman, and Dains then left the property. They retrieved Dains' car, and she followed Schenk and Chapman to Derek Olbertz's house.

Olbertz testified he saw Schenk, Chapman, and Dains on the morning of March 10, 2014, trying to unload items into his backyard and he told them they could not leave the scrap metal there. He testified Schenk, as well as the cab of Schenk's truck where Chapman was sitting, smelled of gasoline. Dains testified

that while at Olbertz's house, Schenk and Chapman moved items taken from the farm including the gun, clothing items, and gas cans to her car. Dains then took Chapman to the hotel where he was staying, and Chapman unloaded the gun, clothing items, and gas cans.

A fire was reported, and officers arrived at Huelsing's farm on the afternoon of March 10, 2014. Officers found both the small truck and the mobile home on fire. Officers also found Huelsing's badly-burned body near the mobile home. After the fire subsided, a body—later identified as Huisenga's—was found inside the mobile home. The medical examiner testified Huelsing sustained two gunshot wounds to his chest, one to his back, and one to the back of his head. The medical examiner stated Huisenga likely had sustained one to four gunshot wounds based on evidence of internal lacerations and skull fractures.

A witness who drove by Huelsing's farm on the way to school every day testified that on the morning of March 10, 2014, she saw two "skinny" men standing near a blue extended-cab truck on Huelsing's property.

On March 12, 2014, Chapman and Schenk went to Dains' house. Dains testified they were worried, said they were going to Mexico, and told her not to tell police officers anything she knew. While Chapman and Schenk were at her house, officers arrived and arrested them.

When interviewed by police officers, Chapman admitted his involvement in the crimes but purposefully lied and did not reveal the location of the gun or other incriminating items. However, Schenk provided information leading the officers to find the items left near the motel where Chapman was residing, including a rifle and ammunition, clothing, and items belonging to Huelsing and Huisenga.

Huelsing's blood was found on the rifle. The neckline and cuffs of a black coat found with the items, along with a stain on the left pocket of the coat, were found to contain Chapman's DNA. Huelsing's DNA was extracted from a blood stain on the underneath side of the left sleeve of the black coat. Additionally, a pair of jeans found with the other items was determined to have Schenk's DNA on the waistband. Huelsing's DNA was extracted from a spot of blood found on the back of one of the legs of those jeans. Gas cans were also found inside Chapman's hotel room.

On March 21, 2014, Chapman was charged by trial information with two counts of first-degree murder and one count of first-degree arson.[2] Jury trial was held April 28, 29, and 30, and May 1, 4, and 5, 2015. The jury returned guilty verdicts on both counts of first-degree murder, and on one count of reckless use of fire—a lesser-included offense of second-degree arson. The jury verdict did not designate whether Chapman was found guilty as the principal or as an aider and abettor to each of the first-degree-murder convictions. Chapman filed a motion for new trial and a motion in arrest of judgment on May 22, 2015. The district court denied the motions prior to the sentencing hearing held June 5, 2015. Chapman was sentenced to incarceration for the rest of his life without the possibility of parole on each count of first-degree murder and incarceration for a period of one year on the count of reckless use of fire.

**II. Standard of Review.**

We review claims of ineffective assistance of counsel de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). Sufficiency-of-evidence claims are

---

[2] The first-degree arson charge was later amended to second-degree arson.

reviewed for correction of errors at law. *State v. Tyler*, 873 N.W.2d 741, 746 (Iowa 2016). And "[w]e review a district court's ruling as to whether a verdict was contrary to the weight of the evidence for abuse of discretion." *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013).

**III. Analysis.**

***A. Ineffective Assistance of Trial Counsel—Jury Instructions.*** Chapman first asserts trial counsel was ineffective in failing to object to improper jury instructions regarding Chapman's guilt as an aider and abettor to the murders of Huelsing and Huisenga.

"To prevail on a claim of ineffective assistance of counsel, a claimant must satisfy the *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)] test by showing '(1) counsel failed to perform an essential duty; and (2) prejudice resulted.'" *Clay*, 824 N.W.2d at 495 (quoting *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008)). Both elements must be proved by a preponderance of the evidence. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). "[B]oth elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001).

Chapman contends jury instructions on the first-degree-murder counts were improper because they did not contain the instruction that Chapman could only be found guilty as an aider and abettor based on the principal's malice aforethought if Chapman had knowledge of the principal's malice aforethought.

Jury Instruction No. 18 provided in relevant part:

The State must prove all of the following elements of Murder in the First Degree, (Marvin Huelsing):

1. On or about the 10th day of March, 2014, the defendant:

    (a) shot Marvin Huelsing.

    or

    (b) Aided and abetted another person who shot Marvin Huelsing.

2. Marvin Huelsing died as a result of being shot.

3.     (a) The defendant acted with malice aforethought;

    or

    (b) The person the defendant aided and abetted acted with malice aforethought.

4.     (a) The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Marvin Huelsing;

    or

    (b) The person the defendant aided and abetted acted willfully, deliberately, premeditatedly and the defendant knew the other person acted with a specific intent to kill Marvin Huelsing.

Jury Instruction No. 35 with respect to the first-degree-murder count for the murder of Alice Huisenga was substantially identical.

With respect to malice aforethought, Jury Instruction No. 20 provided in relevant part, "'Malice aforethought' is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time."

Instruction No. 24 permitted the jury to infer malice, premeditation and specific intent if "a person has the opportunity to deliberate and uses a dangerous weapon."

As to specific intent, Instruction No. 25 provided, "'Specific intent' means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind."

In essence, Chapman contends both marshalling instructions Nos. 18 and 35 should have also required the State to prove Chapman had malice aforethought or he knew Schenk had malice aforethought. Chapman relies upon comments in *State v. Bogan*, 774 N.W.2d 676, 684 (Iowa 2009), where the court addressed other issues that could arise on retrial. The court stated,

> Bogan raised, through an ineffective-assistance-of-counsel claim, that the district court's jury instructions contained error because they failed to require the State to prove the defendant acted with malice aforethought or with the knowledge that those he aided and abetted acted with malice aforethought. *See State v. Tangie*, 616 N.W.2d 564, 573 (Iowa 2000). The State agrees the jury should have been instructed on this requirement. Because we have already reversed Bogan's conviction on other grounds, we need not reach the issue of ineffective assistance of counsel. Nonetheless, the court will have an opportunity to instruct the jury properly on remand.

*Bogan*, 774 N.W.2d at 684. Thus, there was no analysis in *Bogan* of the issue presented here.

In *Bogan*, the court cited to *Tangie*, 616 N.W.2d 564, where the issue of the necessary proof was fully addressed. In *Tangie*, the court stated, "When intent is an element of the crime charged, a person may be convicted as an aider and abettor by participating either with the requisite intent or with the knowledge that the principal possesses the required intent." 616 N.W.2d at 573. In *Tangie*, the court was reviewing the propriety of the jury instruction for murder in the second degree. *Id.* The intent element for murder in the first degree requires the specific intent to kill with malice aforethought. *See* Iowa Code §§ 707.1, .2.

Here, the jury was properly instructed that to be found guilty for first-degree murder, Chapman must have acted with a specific intent to kill or possessed knowledge of the principal's specific intent to kill. *See Tangie*, 616

N.W.2d at 573.[3]  If Chapman possessed knowledge of the principal's specific intent to kill, Chapman also possessed knowledge of the principal's "fixed purpose or design to do some physical harm to another which exist[ed] before the act [wa]s committed" under these facts.  *See Tyler*, 873 N.W.2d at 751 ("We recently elaborated on the distinction between malice aforethought and specific intent to kill in *State v. Ceretti*, 871 N.W.2d 88, 93-94 (Iowa 2015), emphasizing that the former concept is broader than the latter."); *see also Ceretti*, 871 N.W.2d at 93 ("Murder is a killing with malice aforethought, and is presumptively second-degree murder unless the circumstances elevate it to first-degree murder."). "Malice aforethought is a general intent, a state of mind that need not be accompanied by a specific intent to kill."  *Ceretti*, 871 N.W.2d at 93-94.  But to obtain a conviction for murder in the first degree, the State must establish the defendant had a specific intent to kill.  *Id.*

Significantly, in *Ceretti*, our supreme court also stated that although "malice aforethought is not necessarily accompanied by an intent to kill," "[a] person who acts with intent to kill also acts with malice aforethought."  *Id.* at 94 n.4.  Accordingly, here, the jury was not required to find that Chapman had malice aforethought to be convicted as an aider and abettor.  If the jury found that Schenk had the specific intent to kill and Chapman had knowledge of Schenk's intent, then Chapman also knew of Schenk's malice aforethought.

---

[3] The jury instruction on aiding and abetting also stated:
> If the crime charged requires a specific intent, before you can find the defendant "aided and abetted" the commission of the crime, the State must prove the defendant "aided and abetted" with knowledge the others who directly committed the crime had such specific intent.  If the defendant did not have the knowledge the others had such specific intent, he is not guilty of aiding and abetting, the crime charged.

Because the jury found Chapman guilty utilizing proper jury instructions regarding specific intent, Chapman cannot establish counsel was ineffective for failing to object to the jury instructions.[4]

**B. Ineffective Assistance of Counsel—Prejudice.**  Even if our analysis with respect to the jury instructions is in error, Chapman cannot establish prejudice.  "Prejudice exists where the claimant proves by 'a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different.'"  *Clay*, 824 N.W.2d at 496 (citations omitted).

Here, the record reveals ample evidence of Chapman's knowledge of Schenk's malice aforethought and specific intent.  Chapman himself testified Schenk told him if people came they would kill them.  Chapman and Schenk took possession of ammunition and at least one gun from the mobile home.  Chapman also testified when Schenk was threatening Huelsing and Huisenga with the weapon—demanding they throw their phones and yelling—Chapman remembered what Schenk had said about killing people that arrived at the property, observed how Schenk was acting, and was concerned Schenk intended to hurt Huelsing and Huisenga.  There is no question that Chapman

---

[4] Chapman argues the jury could have found Chapman knew Schenk acted with specific intent but did not know Schenk acted with malice aforethought because Chapman could have believed Schenk was acting as a result of his impaired mental state due to the use of methamphetamine.  We conclude such an argument is speculative at best.  Moreover, Chapman cites no Iowa authority in support of his argument an individual cannot possess the requisite malice aforethought while in an impaired mental state due to drug use.  *See* Iowa R. App. P. 6.903(2)(g)(3) ("An argument containing the appellant's contentions and the reasons for them with citations to the authorities relied on . . . . Failure to cite authority in support of an issue may be deemed waiver of that issue.").  In fact, evidence in the record supports the opposite conclusion.  Defense expert Dr. Cynthia J. Paul was asked, "So someone that's using methamphetamine, in general, still can have the capacity to form specific intent?"  She responded, "Likely so."

was aware of Schenk's fixed purpose to do physical harm to Huelsing and Huisenga. Both Huelsing and Huisenga were victims of gun shots and killed. There is no evidence of Chapman objecting to Schenk's course of conduct or withdrawing from the scene. Thus, even if trial counsel had objected, there is no reasonable probability the outcome of the trial would have been different.

Because we find no prejudice, we conclude Chapman has failed to prove his ineffective-assistance-of-counsel claim.

***C. Insufficient Evidence.*** Chapman also contends his convictions are not supported by substantial evidence.

In reviewing the sufficiency of the evidence for correction of errors at law, "we view the evidence in the light most favorable to the State" and uphold the verdict "if substantial evidence supports it." *Tyler*, 873 N.W.2d at 746-47 (citation omitted). "Evidence is considered substantial if . . . it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* at 747 (citation omitted). In evaluating a sufficiency-of-the-evidence claim:

> Direct and circumstantial evidence are equally probative. A jury is free to believe or disbelieve any testimony it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive. . . . A jury's assessment of credibility may only be ignored on appeal when the testimony is so impossible, absurd, and self-contradictory that it may be deemed a nullity.

*State v. Speaks*, 576 N.W.2d 629, 632 (Iowa Ct. App. 1998) (internal citations omitted).

Chapman asserts, due to Chapman's and Schenk's methamphetamine use, the record does not contain evidence of Chapman's or Schenk's specific intent necessary to sustain Chapman's convictions. Chapman also asserts the

record does not contain substantial evidence of Chapman's aiding and abetting Schenk in anything other than the theft of scrap metal. "To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *Tyler*, 873 N.W.2d at 750 (citations omitted).

> Neither knowledge of the crime nor proximity to the crime scene are enough to prove aiding and abetting. However, they are factors, which with circumstantial evidence such as 'presence, companionship, and conduct before and after the offense is committed,' may be enough to infer a defendant's participation in the crime.

*Tangie*, 616 N.W.2d at 574.

Chapman also contends the record does not contain substantial evidence of Chapman's knowledge of Schenk's malice aforethought and there is insufficient evidence to support his conviction for reckless use of fire. We find there is substantial evidence supporting each of Chapman's convictions.

*1. First-Degree Murder of Alice Huisenga.* Chapman first asserts the record reveals Chapman's long-term methamphetamine use and methamphetamine use on the day of the murders affected his cognitive abilities. Thus, Chapman argues the record does not support a finding beyond a reasonable doubt that Chapman was capable of forming the requisite specific intent to support his conviction for the first-degree murder of Huisenga. Instruction No. 27 explained to the jury that a defendant is responsible for his acts while under the influence of drugs, and "[i]ntoxication is a defense only when

it causes a mental disability which makes the person incapable of forming the specific intent."

The jury heard testimony from Chapman's own expert witness, Dr. Paul, an outpatient psychiatrist, regarding the effects of methamphetamine use, as well as testimony from Chapman regarding his state of mind on the day of the murders, and did not find Chapman incapable of forming the requisite specific intent. "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citation omitted).

Chapman was cognizant enough to realize someone may show up on the property to feed the cows. Schenk said they would have to kill them. They were both mentally able to use a multitude of methods in attempting to extract Schenk's truck from the mud. When Huelsing and Huisenga arrived, Chapman and Schenk hid, then forced the victims into the mobile home, shot them, and took significant steps to conceal their own connection to the scene. The actions of Chapman and Schenk reflect clarity of mind and purpose, not mental disability.

Chapman also asserts while under the influence of methamphetamine Schenk was very controlling, he feared Schenk, and thus, Chapman acquiesced to Schenk's demands. However, the record does not support this contention. Moreover, the jury was not instructed on the defense of compulsion, nor does Chapman complain the jury should have been so instructed. *See* Iowa Code § 704.10. We note Chapman aided in directing the victims into the mobile home—where Huelsing was first shot and Huisenga was killed—by brandishing a knife. Dains testified after Chapman came back to Schenk's truck following the

shootings, Chapman stated he had to "take control because [Schenk] couldn't go through with it." The jury was entitled to infer from this statement that although Schenk may have shot Huelsing, it was Chapman who fired the fatal shots that killed both victims. This inference is further supported by Chapman's admission that he shot Huisenga, along with his actions following the murders in concealing evidence clearly showing Chapman's culpability for the crime.

On the other hand, the jury could have believed Chapman to the extent he was just following Schenk's lead. The jury could have concluded, as Chapman testified, that Schenk first possessed the gun, then gave the gun to Chapman, and told Chapman to shoot Huisenga. Chapman confessed to shooting the gun at Huisenga one time. Viewing the evidence in a light most favorable to the State, Huisenga was shot as many as four times. After Chapman shot the gun, he gave or threw the gun back to Schenk and ran from the mobile home. Schenk, now in possession of the gun and intent on killing anyone who arrived on the property, then had the opportunity to fire the fatal shots killing Huisenga. Schenk also returned to the mobile home before setting it on fire and had still another opportunity to fire the fatal shots.

In either event, there is substantial evidence in the record supporting Chapman's conviction for the first-degree murder of Huisenga as a principal or as an aider or abettor. Moreover, Chapman had sufficient mental capacity to form the requisite specific intent or sufficient mental capacity to know of Schenk's specific intent.

*2. First-Degree Murder of Marvin Huelsing.* Chapman also asserts the district court erred in denying his motion for judgment of acquittal because there

is not substantial evidence supporting his conviction for the first-degree murder of Huelsing. We find the record contains substantial evidence supporting Chapman's conviction for the first-degree murder of Huelsing as a principal or an aider and abettor as well as sufficient mental capacity as we noted with respect to the first-degree murder of Huisenga.

There is substantial evidence in the record to establish Chapman was a principal or aided and abetted Schenk in Huelsing's murder. Both Chapman and Schenk were present at the scene and were companions, using methamphetamine together and jointly stealing scrap metal. The evidence reflects Chapman's knowledge of Shenck's intention to harm individuals who came to the farm and shows Chapman actively took part in the murders. As previously noted, prior to the shootings, Schenk told Chapman they would kill anyone who came to the farm. Chapman helped Schenk search the mobile home and helped Schenk arm himself by finding shells for the rifle. When Chapman and Schenk heard a vehicle approaching, Chapman armed himself with a knife. Chapman again stated he considered Schenk's intention to harm Huelsing and Huisenga when Schenk was threatening them at gunpoint to throw their phones. Chapman brandished a knife to direct the victims into the mobile home—where Huelsing was first shot and Huisenga was killed. Chapman admits to shooting Huisenga. Even though Schenk may have first shot Huelsing, he was apparently only wounded as he grappled with Schenk before being pushed to the ground by Chapman and shot again in the chest and head. Dains testified Chapman stated just after the shootings he "had to take control because [Schenk] couldn't go through with it." Dains' testimony provides sufficient

evidence from which the jury could infer Chapman was the principal or aided and abetted Schenk in Huelsing's murder.

The evidence in the record also reveals Chapman actively took part in concealing evidence following the murders. Dains testified she witnessed Chapman and Schenk standing over Huelsing's body whispering. Dains stated Chapman and Schenk broke Huelsing's and Huisenga's cell phones. Dains also testified Chapman stated they needed to "get rid of" the small truck, "like start it on fire or something." Chapman then spray painted over areas of a tractor where he suspected their fingerprints might be discovered while Schenk lit the small truck on fire. Dains testified Chapman took the incriminating items removed from the crime scene, including the gun, clothing, and items belonging to Huelsing and Huisenga from her vehicle. The items were later discovered in a location near the hotel where Chapman was residing. Chapman testified he was not truthful with officers regarding the location of the items.

The physical evidence as presented at trial also supports Chapman's involvement. A black coat was found among the other incriminating items, including the rifle with Huelsing's blood on it and items belonging to Huelsing and Huisenga. The black coat indicated Chapman was the wearer, as Chapman's DNA was found on the neckline and cuffs of the coat. A bloodstain on the underside of the left sleeve of the black coat contained Huelsing's DNA.

Also, following the March 10, 2014 murders, Dains testified Chapman and Schenk came to her apartment and stated they needed to flee to Mexico. They told Dains officers would question her regarding the March 10 events and not to tell officers anything she knew.

The record contains overwhelming evidence supporting Chapman's presence during the murders and companionship with Schenk, and his conduct before, during, and after the murders provides a strong inference of his participation in the crimes. We therefore conclude Chapman's conviction for the first-degree murder of Huelsing under either theory, as a principal or aider and abettor, is supported by substantial evidence.

*3. Reckless Use of Fire.* Last, Chapman contends there is insufficient evidence to support his conviction for reckless use of fire. We disagree.

Iowa Code section 712.5 provides, "Any person who shall so use fire or any incendiary or explosive device or material as to recklessly endanger the property or safety of another shall be guilty of a serious misdemeanor."

Dains testified Chapman stated they had "to get rid of the truck—or get rid of it, like start it on fire or something." Dains testified Chapman and Schenk then went back down near the small truck. The small truck was later found engulfed in flames. Dains also testified Chapman encouraged Schenk to "hurry up" while Schenk went inside the mobile home. Dains saw Schenk emerge from the mobile home as flames became visible coming from the structure. Derek Olbertz testified when Schenk, Chapman, and Dains came to his home shortly after leaving the farm, Schenk smelled of gasoline and the smell of gasoline also emanated from the cab of the truck where Chapman was sitting. Chapman and Schenk worked together to rid the scene of their fingerprints or DNA. During Chapman's interview with law enforcement, Chapman admitted on more than one occasion, "we set the fire."

Thus, even if Chapman did not light the fires himself, he encouraged Schenk or lent countenance to his actions. We therefore find there is substantial evidence supporting Chapman's conviction for reckless use of fire as an aider and abettor.

***D. Verdict Contrary to the Weight of the Evidence.*** Chapman alternatively asserts the district court abused its discretion in denying his motion for new trial because the verdict was contrary to the weight of the evidence.

"On a motion for new trial, . . . the power of the court is much broader [than on a motion for judgment of acquittal]. It may weigh the evidence and consider the credibility of witnesses." *Maxwell*, 743 N.W.2d at 192 (citation omitted). "If the court determines the verdict is contrary to the weight of the evidence and a miscarriage of justice may have occurred, it is within the court's discretion to grant a new trial." *Id.* "The district court has broad discretion in ruling on a motion for new trial." *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). "[T]he power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Maxwell*, 743 N.W.2d at 192 (citation omitted).

At the sentencing hearing, the district court ruled on the motion for new trial, stating, "On the motion for new trial, the court finds that the evidence—the weight of the evidence does not preponderate heavily against the verdict. So the motions are denied." We find no abuse of discretion. For the reasons we previously explained, there is ample evidence establishing Chapman's participation in the crimes. We acknowledge there are reasons to withhold

weight from the testimony of Dains, such as the plea offer tendered to her,[5] but she also acknowledged facts contrary to her interests. Chapman was involved in the criminal activity from start to finish including the attempted cover-up. He admitted he shot Huisenga. His admission may have served to give more credence to his version that he was not the principal and did not fire the fatal shots. Nonetheless, he was an active participant in the murders. He handed the shells to Schenk, and after shooting at Huisenga, he gave the gun back to Schenk knowing Schenk intended to kill anyone that came to the property. His drug usage may have affected his good judgment, but there is credible evidence that he knew and understood what was transpiring the entire duration of the criminal acts. Although he contends he could not form the specific intent to kill, the jury was entitled to withhold weight from his testimony and his expert's testimony on this issue. We find the district court did not abuse its discretion in denying the motion for new trial.

## IV. Conclusion.

We conclude Chapman has failed to prove his claim for ineffective assistance because there was no breach of an essential duty by trial counsel and, moreover, no prejudice. We also conclude there is substantial evidence supporting Chapman's convictions and the verdict is not contrary to the weight of the evidence. We therefore affirm Chapman's convictions and sentences.

**AFFIRMED.**

---

[5] At the time of Schenk's trial, Dains had entered pleas pursuant to a plea agreement to burglary in the second degree and accessory after the fact and was in custody but was awaiting sentencing.