# IN THE COURT OF APPEALS OF IOWA

No. 23-0688
Filed September 18, 2024

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**DWIGHT CHARLES EVANS,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey L. Poulson (trial) and Roger L. Sailer (*Miller* hearing & sentencing), Judges.

The defendant appeals from his convictions and sentences for first-degree murder and going armed with intent. **AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee.

Heard by Greer, P.J., and Ahlers and Badding, JJ.

**GREER, Presiding Judge.**

A jury found Dwight Evans guilty of first-degree murder and going armed with intent following the shooting death of Martez Harrison. Evans, who was seventeen at the time of the shooting, was later sentenced to life imprisonment with the eligibility for parole after twenty years. On appeal, he argues (1) the district court erred in admitting the recording of a jail phone call as non-hearsay by co-conspirators because there was insufficient evidence that Evans was engaged in a conspiracy with them, (2) neither of his convictions is supported by substantial evidence, and (3) the district court abused its discretion in sentencing him to a mandatory minimum of twenty years before he becomes eligible for parole.

**I. Background Facts and Proceedings.**

Following the shooting death of Harrison in the early morning hours of May 1, 2021, Evans was charged with first-degree murder (count I) and going armed with intent (count II). He pled not guilty and filed notice of his intention to rely on the defenses of intoxication and defense of self or of others (i.e. justification).

Before trial, the State moved to admit a recorded phone call between Austin Rockwood, who was incarcerated, and Lawrence Canady. The conversation took place about thirteen hours before Harrison was killed. During it, Rockwood told Canady that Harrison hit the mother of Rockwood's child in the face with a bottle the night before. Canady responded, "On my mama, when I see him I'm gonna put him on his fucking neck." After some more discussion, Rockwood said, "He gotta come up off everything now; it's tax season." Canady agreed, "It's tax time. I swear to God." A little bit later Rockwood said, "I still gotta couple months, so

you all finna run into [him] before me." Canady immediately responded, "Yeah, I'm gonna fuck him up when I see him."[1] Towards the end of the conversation, Canady asked Rockwood where Harrison was living. The State argued the statements were admissible under Iowa Rule of Evidence 5.801(d)(2)(E), which provides that a statement is not hearsay when it is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy. The State asserted that Rockwood, Canady, and Evans were in a conspiracy to injure Harrison, and the statements made in the phone call were in furtherance of that conspiracy. Over Evans's resistance, the district court admitted the phone call.

At the seven-day jury trial, the State introduced undisputed evidence that Evans shot Harrison twice at approximately 1:00 a.m. on May 1, 2021, and Harrison died of the wounds shortly after. Other evidence showed that Harrison was at a bar to celebrate a friend's birthday on the night of April 30 and into the morning of May 1, while Canady, Evans, and others—who were all under the age of twenty-one and not allowed inside the bar—congregated outside. Harrison exited the bar once around 12:45 a.m.; as he was standing outside, Canady ran up and swung at Harrison, seemingly hitting him multiple times before Harrison retreated into the bar.[2] Canady tried to gain entry and follow Harrison inside, but he was stopped by the bar's hired bouncer, who stood in the doorway. Evans stood nearby but was not part of the fistfight. He eventually walked over to join

---

[1] We do not have a transcript of this call; the quoted language is our best attempt at accurately transcribing the statements from the audio recording.

[2] Surveillance footage from a security camera on a nearby business was admitted at trial.

Canady (and others) near the entrance of the bar. According to the bouncer, Canady was "yelling and screaming [and] [s]aying that they [were] going to get" Harrison. At one point, the bouncer called one of the bartenders over to help him. She spoke with Canady, who "was angry and very hostile" and still trying to get inside. He told her he was there to "beat [Harrison's] ass" and said he had a gun. When the bartender confirmed Canady would not be allowed in, he told her he would be waiting for Harrison outside.

Both the bouncer and the bartender warned Harrison not to leave the bar; the bartender intended to help him sneak out a back exit or to call the police for help at the end of the night. But then, at approximately 1:00 a.m., Jessica Goodman—Harrison's fiancée—pulled up outside. When she got out of her vehicle, Canady; Canady's girlfriend, Nya Rang; and another guy, Jordan Hills; all got in Goodman's face and began arguing with her. Evans was standing nearby; he did not take part in the argument. At this point, Harrison came out of the bar. Goodman testified she heard Canady tell Evans to "get it," which she understood to mean a gun. She asked Canady, "[T]hat's what we're going to do? Gun play? That's what we're going to do? We're playing with guns?" Then Canady hit Goodman, which set off a fist fight between Canady and Harrison. The two fought in the street. At one point, Canady fell to the ground, and the fight continued. Then Evans fired one shot, hitting Harrison with a bullet. A few seconds later, with Harrison on the ground and Canady on top of him, Evans fired a second shot as he stood at Harrison's feet. Harrison stayed on the ground while Canady rose, punching Harrison four more times before kicking him and then walking away.

Bystanders immediately called 911, and emergency personnel arrived on the scene within a few minutes. While Harrison was initially conscious, he stopped breathing and lost his pulse while en route to the hospital; he was eventually pronounced dead. The associate state medical examiner testified about the two gunshot wounds, explaining the injuries they caused and opining that each was potentially fatal.

Witnesses told police officers that Canady and Evans were involved in the fight and shooting. Canady, who fled from the scene in a vehicle with Rang and Hills, was stopped just a couple blocks away and was taken into custody. Evans was not taken into custody until about 4:30 a.m., when a concerned citizen called 911 after Evans—who was not known to him—walked up to the man's bonfire and asked to borrow a cell phone and flashlight, stating he lost something nearby. While helping him look for his wallet and cell phone (what Evans claimed he was missing), the concerned citizen found a revolver in the grass. Later testing by the Iowa Division of Criminal Investigation tied the gun to the shooting of Harrison.

Video of Evans being driven to the local police station was admitted into evidence. It showed Evans talking with the officer, asking about the possible return of $100 that he gave the citizen to borrow the flashlight and why there were so many officers with guns pointed at him when he was taken into custody.

At trial, Evans argued he was justified in his action of shooting Harrison because he did so in defense of Canady. Alternatively, he asserted he was too intoxicated at the time of the shooting to form the requisite specific intent. To that end, he introduced testimony from his mother and teenaged sister that he was so intoxicated on drugs, alcohol, or both at 8:00 p.m. the night before the shooting

that he needed help standing and walking. The State introduced surveillance video from a local convenience store that showed Evans walking around in the store at approximately 11:30 p.m. on April 30; his mother testified she saw signs that Evans was intoxicated: "I see it. You may not. I see it. That's not how my son walks. His pants are sagging. He's not—that's not—."

The jury rejected Evans's defenses, finding him guilty of first-degree murder and going armed with intent. After a *Miller*[3] hearing, to which Evans was entitled because he committed the crimes before he turned eighteen, he was sentenced to life with the possibility of parole after twenty years (count I) and a prison term up to five years (count II). He was ordered to serve the two sentences concurrently to each other and other, severed charges. [4]

Evans appeals.

## II. Discussion.

### A. Evidentiary Challenge.

Evans challenges the admission of the recorded jail phone call that took place between Rockwood and Canady, which the district court ruled were non-hearsay statements by co-conspirators.

---

[3] *See generally Miller v. Alabama*, 567 U.S. 460 (2012).
[4] Based on evidence obtained during the investigation into the shooting, Evans was charged with possession with intent to deliver a controlled substance (marijuana) (count III) and failure to affix a drug tax stamp (count IV). He successfully moved to sever these charges from the murder trial. Later, pursuant to a plea agreement with the State, Evans pled guilty to count III in exchange for the dismissal of count IV. He was sentenced to a five-year term of incarceration and ordered to serve it concurrently with the sentences that were not yet imposed in the murder case.

Under our rules of evidence, "statements by a coconspirator are admissible against the party as an admission of a party-opponent." *State v. Tangie*, 616 N.W.2d 564, 569 (Iowa 2000); *see also* Iowa R. Evid. 5.801(d)(2)(E) (providing that "[a] statement . . . is not hearsay . . . [when it] is offered against an opposing party and . . . [w]as made by the party's co-conspirator during and in furtherance of the conspiracy"). Before the court is allowed to admit the evidence, it "must find, by a preponderance of the evidence, that a conspiracy to commit a crime existed between the declarant and the nonoffering party." *Tangie*, 616 N.W.2d at 569. "A conspiracy is 'a combination or agreement between two or more persons to do or accomplish a criminal or unlawful act, or to do a lawful act in an unlawful manner.'" *State v. Huser*, 894 N.W.2d 472, 504 (Iowa 2017) (citation omitted).

The court can consider the challenged statement itself when determining whether a conspiracy existed.[5] *See State v. Dullard*, 668 N.W.2d 585, 596 (Iowa 2003) ("Proof of a conspiracy must include evidence independent of the co-conspirator's statement. *In addition to the statement*, 'the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the content of the statement' must be considered." (emphasis added) (citations omitted)); *see also Tangie*, 616 N.W.2d at 569–70 (considering the defendant's argument that the foundation for admitting a co-conspirator's statement "must be established by evidence

---

[5] The current Iowa Rules of Evidence—which came into effect after Evans's trial—explicitly require the consideration of the statement itself when deciding whether a conspiracy existed. *See* Iowa R. Evid. 5.801 ("The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under (E).").

independent of the out-of-court statement itself," noting "'there is little doubt' a court may consider the out-of-court statement itself to establish the foundational facts to apply the co-conspirator exception under" the federal rules of evidence, and concluding "a similar approach is appropriate under" the Iowa Rules of Evidence). But there must also be "some proof independent of the co-conspirator's statement." *State v. Thai*, 575 N.W.2d 521, 525 (Iowa Ct. App. 1997). "We review a district court's determination that a conspiracy existed under the substantial-evidence test." *Tangie*, 616 N.W.2d at 569.

"Once a conspiracy is established, two conditions must be met for rule [5.801(d)(2)(E)] to apply: the statement must have been made during the pendency of the conspiracy, and it must be in promotion of the conspiracy's object or design." *Id.* at 571. We review the court's ruling that these conditions were met for an abuse of discretion. *Thai*, 575 N.W.2d at 525 ("If we determine substantial evidence [of a conspiracy] existed, we must then determine whether the trial court abused its discretion when it ruled a co-conspirator made the challenged statement during the course and in furtherance of the conspiracy.").

As Evans recognizes, a defendant need not be charged with a conspiracy for evidence to be admitted pursuant to rule 5.801(d)(2)(E). *See id.* And "[a]cts or declarations of conspirators, done or made before the accused joined the conspiracy, are adopted by him so as to be admissible against him." *State v. Baker*, 293 N.W.2d 568, 575 (Iowa 1980) (citation omitted). The existence of the conspiracy may be proved by either direct or circumstantial evidence. *State v. Ross*, 573 N.W.2d 906, 914 (Iowa 1998). "Circumstantial evidence includes the declarations and conduct of the alleged conspirators and all reasonable inferences

arising from such evidence." *State v. Speicher*, 625 N.W.2d 738, 742 (Iowa 2001). And "[i]mportantly, an agreement need not be—and often times is not—formal and express." *Id.* "A tacit understanding—one 'inherent in and inferred from the circumstances'—is sufficient to sustain a conspiracy conviction." *Id.* (citation omitted).

Here on appeal, Evans argues there was no evidence that he was part of an agreement, tacit or otherwise, to assault Harrison. He maintains that "[a]ll we have" is his presence at the scene and the ultimate act of him shooting Harrison, and he contends the district court relied on his general association with Canady and presence at the scene to plug the gap in the State's proof of a conspiracy.[6] *See State v. Kern*, 831 N.W.2d 149, 159 (Iowa 2013) ("'[C]ircumstantial evidence that proves mere presence at the scene of the crime or association with those involved in the crime is not sufficient to show an agreement.' Mere presence or general association creates no more than 'conjecture and speculation' of criminal complicity." (citations omitted)).

While mere presence at the scene of the crime is not enough to establish involvement in a conspiracy, Evans's role in this situation is substantial evidence

---

[6] Insofar as Evans means to challenge the district court's reliance on certain evidence when determining whether a conspiracy existed as improper, we note that Evans entered into a stipulation with the State regarding what evidence the court could consider in making its decision under rule 5.801(d)(2)(E). *See Hackman v. Beckwith*, 64 N.W.2d 275, 800 (Iowa 1954) ("[I]t is elementary a litigant cannot complain of error which he has invited or to which he has assented."). Plus, any complaint that the court wrongly relied on inadmissible hearsay evidence to determine whether a conspiracy existed is without merit. *See* Iowa R. Evid. 5.104 ("Subject to rule 5.104(b), the court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. *In so deciding, the court is not bound by evidence rules, except those on privilege.*" (emphasis added)).

he was more than an innocent bystander who happened to get caught up in the incident. In the phone call at issue, Rockwood informed Canady that Harrison injured the mother of his child and implied that someone else would have to get retribution, since he still had months left to serve on his sentence. It was only about twelve hours later that Canady, Evans, and others congregated outside the bar where Harrison was celebrating a friend's birthday. Evans was present when Harrison came outside the first time and Canady proceeded to swing at and seemingly hit him multiple times before Harrison retreated into the bar. That scuffle did not resolve the issue. In fact, Canady tried to gain entry inside after Harrison retreated. And when he was rebuffed by both the bouncer and the bartender, Canady reported that he was "going to get" Harrison, that he had a gun, and that he would be waiting for Harrison to exit. While Canady broadcast this plan to "get" Harrison, it was Evans who was carrying a gun on his person—even before Canady told him to "get it."[7] About fifteen minutes elapsed between the first time Harrison came outside and when he was drawn out the second time, with the surrounding of his fiancée. And during that time, Evans steadfastly remained outside the bar's only exit with Canady, his best friend. He did not leave or put the gun aside. He stayed until Harrison exited the bar and was drawn into a fistfight with Canady. He left only after shooting Harrison twice. There is substantial evidence Evans was part of a conspiracy to injure Harrison.

---

[7] It is clear from the surveillance video that Evans does not retreat off screen or go anywhere to obtain the firearm between the time Goodman arrived outside the bar and the shooting of Harrison.

Next, Evans argues the statements made during the phone call were not done in furtherance of any conspiracy and instead were just "idle chatter." *See State v. Dayton,* 10-1161, 2011 WL 4578505, at *5 (Iowa Ct. App. Oct. 5, 2011) ("'Idle chatter' does not meet the test; nor does a 'merely narrative' description by one coconspirator of the acts of another." (citation omitted)). He suggests Rockwood was merely recounting an incident to Canady involving the mother of Rockwood's child—not devising a scheme for retribution or asking anything of Canady. *See id.* (concluding statements were not made in furtherance of conspiracy but rather was one person "simply . . . relating the plan to a trusted friend, who played no role in the murder"). We disagree. Rockwood started the phone conversation by telling Canady about Harrison; it was Rockwood who first announced it was "tax time" and then told Canady that he would see Harrison before Rockwood would—implying Canady would have the chance to seek retribution before Rockwood. When Canady responded with outrage and promised violence, Rockwood did not suggest a different course of action or try to calm Canady down; instead, he told Canady where Harrison was living. Other statements made during the phone call were unrelated to Harrison, for example, when Rockwood and Canady talked about music Canady had playing in the background. These statements were not made in furtherance of the conspiracy and, therefore, were not admissible under rule 5.801(d)(2)(E). But their admission did not affect Evans's substantial rights, so he is not entitled to relief on this basis. *See State v. Krogmann*, 998 N.W.2d 141, 153 (Iowa 2023) (citing Iowa R. Evid. 5.103(a)).

Finally, Evans argues that—at most—the statements made during the phone call were the *initiation* of a conspiracy and so could not be made "in the course of" of the conspiracy. While we understand the distinction for which Evans advocates, we conclude that statements made in forming the conspiracy are admissible under rule 5.801(d)(2)(E). *Cf. United States v. Alex*, 790 F. Supp. 798, 799 (N.D. Ill. 1992) ("[E]ven if the statements are made in the embryonic stages of the conspiracy, they are admissible against those who join the conspiracy later, so long as the statements are made during the course of, and in furtherance of the conspiracy."); *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993) ("The 'in furtherance' requirement embodies the . . . 'desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence.'" (citation omitted)). These statements have the same indicia of reliability as statements made later in the chronology of a conspiracy. *See State v. Kidd*, 239 N.W.2d 860, 865 (Iowa 1976) ("It is not the purpose of the rule to exclude statements relating to the conspiracy uttered during the active [life] of the conspiracy under circumstances indicating reliability."); *Perez*, 989 F.2d at 1578 ("[S]tatements are admissible under the co-conspirator exception if they are intended to promote the conspiratorial objectives." (cleaned up)). And they are similar to other statements that have repeatedly been ruled admissible under the co-conspirator rule. *See Dayton*, 2011 WL 4578505, at *5 ("When a declarant 'seeks to induce the listener to deal with the conspirators or in any other way to cooperate or assist in achieving the conspirators' common

objective,' the declaration may be admissible.  Statements concerning activities of the conspiracy, including future plans, also may become admissible when made with such intent." (citation omitted)); *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000) ("Statements made in furtherance of a conspiracy . . . include comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members.").  Furthermore, the statements made to initiate this conspiracy meet the "in furtherance" requirement, unlike casual remarks that do not incite action towards a conspiracy.  *See United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000) ("Statements which further the conspiracy must be distinguished from mere idle chatter, narrative declarations, and superfluous casual remarks which do not further the conspiracy.").

Having considered each of Evans's arguments against the admission of the recorded jail phone call, we find no reversible error.

**B. Sufficiency of the Evidence.**

Evans challenges the sufficiency of the evidence supporting each of his convictions.

> This court reviews challenges to the sufficiency of the evidence for the correction of legal error.  Under this standard, the court is highly deferential to the jury's verdict.  We will affirm the jury's verdict when the verdict is supported by substantial evidence.  Evidence is substantial when the quantum and quality of evidence is sufficient to "convince a rational fact finder that the defendant is guilty beyond a reasonable doubt."  In conducting substantial-evidence review, this court considers the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the

evidence. "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding."

*State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) (internal citations omitted).

"Where, as here, the jury was instructed without objection, the jury instructions are the law of the case for the purposes of reviewing the sufficiency of the evidence." *Id.* at 802. And it is the State's burden to prove every element beyond a reasonable doubt. *State v. Clark*, 406 N.W.2d 802, 804 (Iowa Ct. App. 1987).

**First-Degree Murder.** To find Evans guilty of first-degree murder, the jury was instructed it had to find the following:

1. On or about the 1st day of May 2021, [Evans] shot . . . Harrison.
2. [Harrison] died as a result of being shot.
3. [Evans] acted with malice aforethought.
4. [Evans] acted willfully, deliberately, premeditatedly and with a specific intent to kill . . . Harrison.
5. At that time, [Evans] was not acting with justification.

The jury was further instructed that Evans's use of force was not justified if it found any of the following:

1. [Evans] did not have a reasonable belief that it was necessary to use force to prevent an injury.
2. [Evans] used unreasonable force under the circumstances.
3. [Evans] knew that the person he helped had provoked the use of force against themselves, intending to use the provocation as an excuse to injure . . . Harrison.
4. [Evans] knew that the person he helped had provoked the use of force against themselves by assaulting . . . Harrison . . . unless:
    a. [Harrison] used force grossly disproportionate to the provocation and [his] use of force was so great [Evans] reasonably believed that he or the person he helped was in imminent danger of death or serious injury, or
    b. [Evans] or the person [Evans] helped withdrew from physical contact with . . . Harrison and clearly indicated to . . .

Harrison that he desired to terminate the conflict, but . . . Harrison continued or resumed the use of force.

5. [Evans] was engaged in an illegal activity in the place where he used force, or [he] knew the person he helped was engaged in an illegal activity in the place where force was used, and they made no effort to retreat and retreat was a reasonable alternative to using force. The illegal activity engaged in by [Evans] or the person [Evans] helped is either:

a. Going Armed with Intent . . . .

b. Assault on . . . Harrison . . . .

On appeal, Evans first argues that the State failed to prove he was not justified in his use of deadly force against Harrison. *See State v. Rubino*, 602 N.W.2d 558, 565 (Iowa 1999) ("When the defense is raised, the burden rests upon the State to prove—beyond a reasonable doubt—that the alleged justification did not exist."). Evans argues that because he was not required to have perfect judgment, and because he fired the first shot when Canady was on the ground while he and Harrison engaged in a fight, there is substantial evidence he was justified in using deadly force. But substantial evidence supports several of the alternatives that made Evans's use of force unjustified, and the jury only had to find one to reject his defense.

Here, it was Canady who provoked the fight, and he did not withdraw. Harrison was not using "force grossly disproportionate to the provocation"—he used his fists in a fist fight. It was Evans who brought and used a gun. *See State v. Jenkins*, No. 21-1718, 2023 WL 4759448, at *7 (Iowa Ct. App. July 26, 2023) (concluding the defendant's use of force was unreasonable "because he brought a gun to a fistfight" and escalated the level of force (cleaned up)). Based on the properly admitted phone call between Rockwood and Canady and the facts already outlined, the jury could also have reasonably concluded that Evans was

not justified in his use of force because he knew Canady provoked Harrison with the intent to use the provocation as an excuse to injure Harrison. And finally, Canady was involved in the illegal activity of assaulting Harrison and neither Canady nor Evans tried to retreat before Evans fatally shot Harrison. There is sufficient evidence Evans was not justified in his use of deadly force against Harrison.

Next, Evans argues the State failed to prove he "acted willfully, deliberately, premeditatedly and with a specific intent to kill" Harrison. "To premeditate is to think or ponder upon a matter before action." *State v. Fryer*, 226 N.W.2d 36, 41 (Iowa 1975). "[P]remeditation and deliberation need not exist for any particular length of time." *Id.* "In finding premeditation and deliberation the trier of facts may consider the fact a defendant has selected a deadly weapon, such as the gun involved here, with an opportunity to deliberate where he thereafter uses it in a deadly manner." *Id.* Here, Evans came armed with a revolver. He waited outside the bar with Canady and, after Harrison was drawn into a second fist fight with Canady, shot Harrison twice. While he fired the first shot when Harrison was on top of Canady, Evans fired the second shot while standing at the feet of Harrison, who was laying on the ground under Canady by that point. Evans tries to counter these "bad facts" with his intoxication defense, arguing he was too intoxicated on drugs, alcohol, or both to form the necessary specific intent. *See State v. Guerrero Cordero*, 861 N.W.2d 253, 261 (Iowa 2015) ("Intoxication has many degrees, and the law does not strive to capture the precise degree of intoxication to sustain the defense of intoxication other than enough evidence to support a finding that the defendant was so intoxicated as to be incapable of formulating or possessing the

specific intent to commit the crime."), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). But the jury had video evidence to assess Evans's physical condition as he moved around the outside of the bar and as he fired the shots directly at Harrison. On top of that, there was video from a gas station that showed Evans up and walking around at approximately 11:30 p.m. on April 30 and video of Evans asking questions of the officer driving him to the police station at about 4:30 a.m. on May 1—evidence that Evans was functioning at a much higher level than the testimony of Evans's mother and sister suggested. Although evidence that Evans was tired and falling asleep— both in the back of the squad car on the way to the police department and later, while he waited in an interview room—could have been evidence of his intoxication, it could also be understood to show a person who was tired after being up all night, as Evans was not taken into police custody until approximately 4:30 a.m. It was up to the jury to decide what evidence was credible and the facts that followed from that evidence. *See State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006) ("[T]he ultimate question is whether [the evidence] supports the finding actually made, not whether the evidence would support a different finding." (citation omitted)). While Evans may not have been completely sober at the time of the shooting, there is substantial evidence he was not so incapacitated to be unable to form the specific intent to kill Harrison. Substantial evidence supports Evans's conviction for first-degree murder.

**Going Armed with Intent.** Evans also challenges the evidence supporting his conviction for going armed with intent. The jury was instructed that Evans was only guilty if it found the following:

1. On or about the 1st day of May, 2021, [Evans] was armed with a revolver.
2. The revolver was a dangerous weapon . . . .
3. [Evans] was armed with the revolver with the specific intent to shoot another person.
4. While armed with the revolver [Evans] moved from one place to another.

Evans challenges the evidence he was armed with the specific intent to shoot Harrison. But Evans's claim relies in part on the idea that the phone call between Rockwood and Canady should not have been admitted, which we have already rejected. And he again points to his level of intoxication as defense against forming the requisite specific intent, which we reject. Substantial evidence supports Evans's conviction for going armed with intent.

**C. Sentencing.**

Following a *Miller* hearing, the district court sentenced Evans to life imprisonment with the possibility of parole after twenty years. Here, Evans argues the district court abused its discretion in imposing a mandatory minimum term he must serve before becoming eligible for parole.

"While there is a presumption against minimum terms of incarceration for juvenile offenders, [our supreme court has] expressly upheld, even commanded, their use if the court concludes that sentence is warranted after consideration of the factors." *State v. Majors*, 940 N.W.2d 372, 387 (Iowa 2020). "[O]ur role on review is for abuse of discretion," which "may exist if the sentencing court fails to consider a factor, gives significant weight to an improper factor, or arrives at a conclusion that is against the facts." *Id.* Yet "if the [sentencing] court follows [the] outlined sentencing procedure by conducting an individualized hearing, applies the

*Miller*/*Lyle*/*Roby* factors, and imposes a sentence authorized by statute and supported by the evidence, then we affirm the sentence." *Id.*

Before sentencing a juvenile offender to a minimum period of incarceration without parole, the sentencing court must consider the following factors:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014) (citations omitted). "Clearly, these are all *mitigating factors,* and they cannot be used to justify a harsher sentence." *Id.* at 402 n.8.

Evans raises several challenges to the district court's reasoning and use of the *Miller*/*Lyle*/*Roby* factors. He argues the court was wrong to conclude he was part of a premeditated plan to hurt Harrison. He also argues that the court should not have relied on "gang affiliations" as an aggravating factor—claiming there was "no actual evidence that [he] was enlisted in a gang or what that gang would be." Evans otherwise points to specific *Miller*/*Lyle*/*Roby* factors, arguing the district court should have placed more mitigating weight on the fact that he had just turned seventeen before the shooting, that he experienced trauma as a child, and that he was intoxicated at the time of the crime.

First, Evans has already lost his challenge that the admission of the phone call between Rockwood and Canady was in error. Plus, there were other indications that Evans engaged in a conspiracy to harm Harrison—the report of

Dr. Tracey Thomas, who performed a forensic psychological evaluation of Evans for the *Miller* hearing, noted: "Records, as well as [Evans's] self-report at interview, indicate he was a full participant in the offense. The offense was planned and executed in a calculated manner." "Our sentencing courts can and should consider the heinous nature of the crime in evaluating whether to impose a mandatory minimum sentence." *Majors*, 940 N.W.2d at 389 (citation omitted). And as for his claim there was insufficient evidence of his gang involvement for the district court to properly consider it when imposing sentence, Evans told both the preparer of the presentence investigation report and Dr. Thomas that he was a member of a gang. *Cf. State v. Grandberry*, 619 N.W.2d 399, 402 (Iowa 2000) ("In determining a defendant's sentence, a district court is free to consider portions of a presentence investigation report that are not challenged by the defendant.").

Additionally, the court orally outlined its consideration of the *Miller/Lyle/Roby* factors. It concluded that Evans's age of seventeen years and two days provided "a moderate degree of mitigation," noting Evans was "clearly a juvenile" but that testing showed his intellectual capabilities were not impaired. In a model format for judges to follow, the court covered extensively the *Miller/Lyle/Roby* factors and continued that it:

> finds in accordance with Dr. Thomas's findings that this defendant shows many markers of sophistication and maturity such as autonomy, an internal locus of control, an ability to anticipate consequences, and foresight. The Court bases this finding on a number of factors, not the least of which are the circumstances of the offense itself and Defendant's actions immediately afterward, to avoid apprehension.
> . . . [The] Defendant exhibited an adult decision-making capability for a significant period of time prior to and during the offense. The majority of those decisions were poor, but they were

undeniably Defendant's own autonomous decisions, and they were made for consistent reasons over a significant period of time.

. . . .

With regard to the second *Lyle* factor, which is the particular family and home environment that surround the youth, the Court finds that Defendant's homelife, as defense counsel put it at the *Miller* hearing, was pathetic. He came from a chaotic and dysfunctional home. He was witness to substance abuse, domestic abuse, and crime on the part of his parents, and his only source of real support was his well-intentioned but ill-equipped and overmatched mother. Thus, the Court again finds some degree of mitigation under this factor.

However, the Court again also finds that the mitigation of this factor is limited. Due to Mr. Evans's circumstances, he was left to his own decision-making at a relatively young age, and his decision was to connect with antisocial peers and involve himself in gang activity, violence, and crime, and that was a decision that he reconfirmed many times over despite ongoing intervention by his mother, the school, and juvenile authorities. He consistently made that autonomous decision.

With regard to the third *Lyle* factor, which are the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime, the crime of which Mr. Evans has been found guilty is, as juvenile court officer Ivy Menke phrased it, the most serious crime that can be committed, and the circumstances surrounding it are not mitigating either in the Court's view.

The evidence shows that the defendant was a full participant in the crime. He pulled the trigger himself—twice, in fact, the second time being after the victim was already laying prone in the street with a wound that the medical examiner testified was fatal or at least potentially so.

The Court strenuously disagrees with Dr. Aiken's view that, quote, "It does not appear the offense was planned; rather, it was an impulsive act on Defendant's part," end quote.

To the contrary, the Court finds on the facts of this case that the murder of Martez Harrison perpetrated by the defendant was a premeditated, preplan, prearranged act that was carried out in cold blood.

The Court further finds the defendant's actions before, during, and after the crime do not demonstrate youthful attributes that would mitigate this particular crime, but rather they demonstrate a fully matured sense of callousness, indifference to others, and disregard for the law and for society.

Was Mr. Evans subject to peer pressure? Almost certainly. Particularly in light of the gang element involved in the facts of this case. In fact, the facts show that it was defendant's friend, Lawrence

Canady who actually had a beef with Martez Harrison, not the defendant.

However, the facts also show that [Evans] was far from a naive young man who was momentarily seduced under the sway of a group of thugs who were taking advantage of him. Quite the contrary. He was a long experienced member of that group who consciously chose that lifestyle and consciously returned to it again and again. The Court finds that the degree of mitigation under this factor, if any, is de minimis.

Number four, the challenges for youthful offenders in navigating through the criminal process. The Court, again, finds little mitigation related to this factor. . . .

The Court finds . . . under the facts in the record, this defendant has been referred to juvenile court services starting at age eleven for robbery, for theft, for criminal mischief, for possession of marijuana, for assault, for assault a second time, for theft a second time, for assault a third time, for disorderly conduct, for trespass, for interference with official acts, and for disorderly conduct for a second time.

He has also had significant and ongoing contact with juvenile court officers over a period of years as well as substantial contact with the juvenile court itself, and he has been offered and/or provided with a plethora of services, diversion alternatives, and informal adjustment agreements by juvenile authorities all related to his offenses.

With regard to *Lyle* factor number five, the possibility of rehabilitation and the capacity for change, the Court, as did the expert witnesses, places significant emphasis on this factor. It's a large part of why we are here and what we are here to decide.

A significant amount of testimony and evidence was presented at the *Miller* hearing with regard to this very important factor, and it is the factor upon which Drs. Thomas and Aiken both disagree. Dr. Aiken's primary argument . . . as to this factor is a general one: That statistically the majority of juvenile offenders do not continue their offending into adulthood. Instead they typically burn out and desist such behavior as they mature beyond adolescence.

The Court considers that fact, but finds much more persuasive the analysis of Dr. Thomas, which is based entirely upon clinical evaluation of this particular defendant.

The Court finds persuasive all of the following, particularly when they are all considered together in the aggregate: First, Defendant's scores on the HARE Psychopathy Checklist, Youth Version, were highest in the categories of antisocial and effective. The antisocial issues such as poor anger control, et cetera—those are amenable to treatment and rehabilitation. Both experts told us that. However, the affective issues such as callousness, lack of

empathy, failure to take responsibility for antisocial and harmful behavior—those types of factors in which also defendant scored high are not only resistant to change but they also actually act as barriers to treatment and rehabilitation, so the experts tell us.

Next, Defendant's scores on the Structure Assessment of Violence Risk in Youth, or SAVRY as it's called, as scored by both Drs. Thomas and Aiken, indicate a large number of significant risk factors for future violence. And perhaps even more alarmingly, Dr. Thomas points out that, according to her testing, the defendant not only possesses a high degree of risk for these factors, but also lacks any protective factors at all that might mitigate against those risks.

Next, Dr. Thomas testifies that the Risk Sophistication Inventory is particularly telling in this sentencing decision because it was developed specifically for juveniles and young adults and, therefore, as she put it, it, quote, "goes to the crux of a *Miller* hearing." The Court agrees.

The Court finds that the results of this test in the defendant's case are particularly alarming given the totality of these findings that, one, Defendant's risk for dangerousness is high; two, Defendant's sophistication and maturity level is high; three, Defendant's treatment amenability is low; and, four, Defendant's high level of sophistication in maturity is shown to be used by him toward antisocial ends.

Next, the Court also finds that Dr. Thomas's diagnosis of Defendant with antisocial personality disorder is convincing and compelling as is her explanation that this diagnosis, which Dr. Aiken did not make, is indicative of a persuasive ongoing pattern of disregard and violation of the rights of others, and it is specifically associated with risk for violence.

Next, the Court further notes Defendant's history with various interventions and services that have been offered and/or provided to him over the course of the years, a period of years. . . .

The defendant has been provided these services, often more than once, to specifically address all of these following issues . . . . The Court's point is that all of those services that the Court listed off were provided specifically to address all of those issues.

And although there have been moments of isolated success— and the Court acknowledges that—none of these interventions or services have been successful on any permanent basis, and many failed due to Defendant's defiance or refusal to follow through with them.

Next, the Court finds that the nature of the defendant's treatment and rehabilitation needs are significant and entrenched and will not be easily overcome. The Court finds that Defendant's significant factors for future offending are high and are without any protective factors to mitigate against them, and the Court finds that

the defendant has demonstrated a substantial and ongoing resistance to any efforts toward treatment and rehabilitation.

This Court is not about to find that any defendant, including Mr. Evans, is beyond all hope of treatment and rehabilitation.

Indeed, that's what I believe, Mr. Evans, virtually everyone in this room hopes for you, that you can achieve treatment and rehabilitation. It's certainly my hope.

However, the Court does not find any significant mitigation under this factor in the *Lyle* analysis given the factors that have been presented, and the Court further finds that any real prospects for meaningful rehabilitation would be exponentially increased in the controlled environment of incarceration.

After the *Miller* hearing and a separate sentencing hearing, the district court considered each of the *Miller*/*Lyle*/*Roby* factors at length—recognizing that each was to be applied in mitigation only—and imposed a sentence authorized by statute. "We do not decide the sentence we would have imposed, but whether the sentence imposed was unreasonable." *State v. Hopkins*, 860 N.W.2d 550, 554 (Iowa 2015). Here, because the court neither considered inappropriate information nor abused its discretion in weighing the various factors, we affirm Evans's sentences.

**III. Conclusion.**

Because the district court did not commit reversible error in admitting a recorded jail phone call that contained the conversation of Evans's co-conspirators and substantial evidence supports each of his convictions, we affirm Evans's convictions. And because the court neither considered inappropriate information nor abused its discretion in weighing the various factors allowed to be considered, we affirm Evans's sentences.

**AFFIRMED.**