# IN THE COURT OF APPEALS OF IOWA

No. 24-0640
Filed December 3, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ROBERT DAVID LYONS,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.

A defendant appeals his convictions for three counts of attempted murder and two counts of willful injury causing serious injury.  **AFFIRMED.**

Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Brenna Bird, Attorney General, and David Banta, Assistant Attorney General, for appellee.

Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

Robert Lyons fired thirty rounds from his Colt M4 Carbine—a military style rifle—at three visitors outside his house.[1]  He then found a new vantage point and shot five more rounds from a Springfield XDM .45 caliber pistol.  Two of those visitors suffered gunshot wounds.  A jury convicted Lyons on three counts of attempted murder and two counts of willful injury causing serious injury.  In this appeal, Lyons contends the district court erred in rejecting his justification defense and finding that he aided and abetted his daughter, Rebecca Lyons, and his granddaughter's boyfriend, John Alcorn.  He also argues that the verdicts were contrary to the weight of the evidence because the record showed that Lyons reasonably believed that the three visitors "were there to shoot up his house."

His claims fail on appeal.  First, because the record includes substantial evidence that Lyons acted without justification and knowingly encouraged and participated in these crimes, we find no error in the district court's denial of his motion for judgment of acquittal.  Second, because the district court did not rule on the weight-of-the-evidence, the new-trial issue is not preserved.  Thus, we affirm his convictions.

I.      **Facts and Prior Proceedings**

In 2022, Robert Lyons lived with his family in Des Moines.  Along with his wife, Vicki, his household included his daughter, Rebecca, and her three teenaged children.[2]  In March, his granddaughter Keke's boyfriend, Alcorn, arrived at their

---

[1] In this opinion, we refer to the victims by their first names: Jerrel, Jeramie, and Stephanie.

[2] For clarity's sake, we use first names for Robert and Rebecca Lyons when we refer to them individually.

house with property that he had taken from his roommate Jerrel in Davenport. The dispute over that property sparked the violent events at issue here.

Alcorn moved into Jerrel's apartment just before Thanksgiving 2021. Jerrel was working full-time for a local company, but he also had a "side hustle" selling marijuana and Ecstasy. After Alcorn moved in, Jerrel recruited him to sell drugs, which allowed Alcorn to cover his delinquent rent payments. But their arrangement did not work out as Jerrel expected.

In March 2022, Jerrel confronted Alcorn, accusing him of owing a drug debt of $400. According to Jerrel, Alcorn agreed to buy "a pound of weed" for Jerrel to sell. But when Jerrel came home from work on March 11, he found the apartment unlocked and he was missing cash, a pair of Jordan sneakers, and other items. He suspected Alcorn had taken the property. When Jerrel tried to reach his roommate, Alcorn ignored his calls.

Two days later, Jerrel confirmed his suspicion by text messaging with Keke, who was with Alcorn in Des Moines. After leaving Davenport, Alcorn stayed at the Lyons' house. And that's where Alcorn stashed what he took from Jerrel, according to Keke. In a video call, Jerrel offered to pay Keke to retrieve his property. During that call, Alcorn took Keke's phone. By his own testimony, Alcorn was "furious" when he discovered Keke was talking to Jerrel. His fury led to a series of text threats from Keke's phone, including: "N----- u dead I got fire u dead." In another text from Keke's phone, Jerrel received an address for the Lyons' house.

After this exchange with Keke, Jerrel decided to travel to Des Moines to recover his belongings. He found a ride with his friend Jeramie and Jeramie's

girlfriend, Stephanie. Stephanie was happy to drive; she just bought a Ford Escape and was a "huge fan of road trips." The trio left Davenport around 5:30 p.m. and arrived in Des Moines just before 9:00 p.m. Stephanie parked across the street from the address that Jerrel had for the Lyons' house.

Jerrel walked to the front door by himself. He rang the doorbell, which was equipped with a video camera that captured the events. That video showed Jerrel waiting patiently for someone to answer. When Robert came to the door, Jerrel explained in measured tones that he was there to talk to Keke or Alcorn. Jerell told Robert that Alcorn "took his stuff" and that "if my stuff is here I would like to get my stuff back." Soon Rebecca stepped outside and said she was "armed to carry." She also said that Alcorn left, which wasn't true.[3] She said that this was her parents' house and "shit can't be popping off over here." Jerrel assured her that he and his friends were unarmed.[4] Rebecca gave Jerrel her phone number, and she agreed to check on his belongings. During their exchange, Robert reappeared at the door carrying an M4 Carbine rifle, while Rebecca pulled a pistol from her sweatshirt. In reaction, Jerrel hopped down from the stoop, hands in the air, reminding them that he "was not armed." Robert responded: "Well, we are all armed." Rebecca added: "We got M4s, we got AKs, we got everything. And we're ready to shoot up whoever comes over here."

After hearing news of their arsenal, Jerrel walked toward the Ford Escape, before noticing that he did not have Rebecca's number saved in his phone. He

---

[3] Rebecca testified that Alcorn told her that Keke had cheated on him and that "people were coming from Chicago to kill him."

[4] Jerrel didn't know that Stephanie had an unloaded firearm in her purse. She had a license to carry and did not remove the gun during these events.

rang the doorbell again, stepped off the stoop, and waited. But rather than answer the door, Rebecca yelled out the window that the police were on their way. Jerrel replied "that's fine" but repeated that he "got scared and lost [her] number." Then, as Jerrel stood in the middle of the lawn, shots rang out.

At trial, Alcorn took responsibility for the opening salvo. But he told the jury that they were warning shots:

> So I don't know what was being said at the door, what was being said in the yard. I just know I kept on hearing Rebecca saying, "You need to leave, we're calling the police." Then I seen a revolver on the counter and I asked the grandmother, "Is this like Florida, stand your ground?" She confirmed it and said yes, and that's when I took the revolver and I shot two times.[5] I wasn't aiming at Jerrel, I aimed directly behind him.

Meanwhile, just before the shooting started, the grandmother, Vicki Lyons, called 911 to ask for help: "We've got some guys from Chicago down here, we were told they're coming down here to shoot my house up." She told the dispatcher that they rang the doorbell twice. She warned: "We're armed to the hilt, so if we want to have a gun fight. I'm telling you right now, this is what we're going to do." While she's still on the line, shots ring out and she told the dispatcher: "they're sitting outside my house, they're all fucking shooting man."

By the time Alcorn started shooting, Robert had slipped out the back door and "stationed" himself at the corner of the house to "get to a better vantage point." From that vantage point, Robert emptied the thirty-round magazine of the M4 carbine rifle, before going back inside the house and firing another five rounds

---

[5] The record does not support Alcorn's claim to firing only twice. Rather, the State's evidence suggested that he discharged all six rounds from a .356 revolver—out the same window where Rebecca had been calling to Jerrel.

from a .45 caliber pistol. The last shooter was Rebecca. She discharged seven rounds from the same window with a nine-millimeter pistol.

The bombardment of bullets took a toll on Stephanie and Jeramie. Stephanie suffered gunshot wounds to her left shoulder, left hip, and neck. Her Ford Escape was riddled with bullet holes. Jeramie was shot in the chest and struggled to breath. At trial, the defendants stipulated that the shooting caused Jeramie and Stephanie serious injuries. Jerrel was uninjured.

When police responded to the chaotic scene, they secured six individuals who had been inside the Lyons' home, including Robert. Crime scene investigators seized eleven firearms from inside the house and collected shell casings from the guns that were fired. Rebecca told an officer that Jerrel "started opening fire" from Stephanie's vehicle. Alcorn and Robert also claimed in their police interviews that Jerrel and his companions fired first from across the street. At trial, Alcorn agreed that he lied to police about who shot first but blamed Robert for suggesting that narrative.

The State charged Robert, as well as his daughter Rebecca and Alcorn, with three counts of attempted murder and two counts of willful injury causing serious injury. The jury found Robert guilty as charged.[6] The court sentenced him

---

[6] The jury also found Alcorn guilty as charged. As for Rebecca, the jury found her guilty on the attempted murder counts, but acquitted her of willful injury, instead returning guilty verdicts on the lesser-included-included charges of assault with intent to inflict serious injury. Along with this decision, we are filing opinions in those codefendants' appeals today. *State v. Alcorn*, No. 24-0575, 2025 WL _____ (Iowa Ct. App. Dec. 3, 2025); *State v. Rebecca Lyons*, No. 24-0598, 2025 WL _____ (Iowa Ct. App. Dec. 3, 2025)

to a prison term not to exceed twenty-five years with a mandatory minimum sentence of seventeen and one-half years. He now appeals.

## II. Analysis

### A. Did the district court err in denying Robert's motion for judgment of acquittal?

Robert argues that the State did not offer sufficient evidence to generate a jury question on his offenses. His argument is two-fold. (1) The State did not rebut his justification defense. And (2) the State did not prove that he was liable under a theory of aiding and abetting. We will address each claim in turn.

We review for the correction of legal errors. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We will uphold the guilty verdicts if they are supported by substantial evidence. *Id.* Substantial evidence exists when a rational jury would be convinced that the accused is guilty beyond a reasonable doubt. *Id.* We review all relevant evidence in the light most favorable to the State. *Id.*

### 1. Did the State prove that Robert lacked justification?

In his first sufficiency challenge, Robert argues that the State failed to establish that his actions were not justified. *See* Iowa Code §§ 704.1, 707.11, 708.4 (2022); *see also State v. Howard*, 14 N.W.3d 763, 767 (Iowa Ct. App. 2024) ("[T]he State bears the burden to disprove justification once properly invoked by a criminal defendant."). Under the jury instructions, the State had the burden to prove beyond a reasonable doubt that Robert either (1) had no reasonable belief that it was necessary to use force to prevent an injury or loss, or (2) used unreasonable force under the circumstances. According to Robert, the State's proof did not satisfy either option. The State counters that it met both tests.

Much of Robert's defense centers on the story he heard from Alcorn, that "gang members were on their way from Chicago to shoot up the house." Despite meeting Alcorn just a day earlier, Robert took his word as gospel and channeled the fear that Alcorn expressed into a literal call to arms. On cross-examination, Robert revealed his preconception that "some people from Chicago" aren't normal, testifying: "I think if you watch the news and stuff, you'll see just how dangerous Chicago is and just how a lot of people in Chicago, you know, there's a lot of shootings, a lot of gang violence."

But as the State points out, the prosecutors presented video evidence of Jerrel's calm demeanor and peaceful conduct after ringing the Lyons' doorbell. A jury could have found that Jerrel's conduct dispelled Robert's notion that Jerrel was combative. *See generally State v. Rains*, 574 N.W.2d 904, 915 (Iowa 1998) (rejecting defendant's "reasonable belief" that force was necessary to defend himself against officer who was only asking questions), *overruled on other grounds by State v. Williams*, 895 N.W.2d 856 (Iowa 2017).

Yet on appeal, Robert impugns Jerrel for returning to the door after learning that the Lyons were "all armed." In Robert's estimation, "[a]ny reasonable person who is told by the landowners that they have AK47 rifles would leave the premises—unless they are armed themselves. Nevertheless, he persisted." Robert describes Jerrel's request for Rebecca's phone number as "loitering" in their lawn, and Robert claims that he "legitimately feared they would start 'peppering' his house with gunfire."

His description is myopic. What matters is that a rationale jury could interpret these events far differently. After seeing the video and hearing the

testimony of the victims, the jury could have reasonably concluded Robert lacked a reasonable belief the use of force was necessary. *See State v. Clark*, No. 23-1313, 2024 WL 5153099, at *5 (Iowa Ct. App. Dec. 18, 2024). That conclusion was bolstered by Robert's reaction after the shooting, instructing Alcorn to tell police that the visitors fired first. *State v. Van Hemert*, No. 19-1273, 2020 WL 5944441, at *4 (Iowa Ct. App. Oct. 7, 2020) (finding jurors could believe that someone who reasonably believed they had acted in self-defense would not lie or omit information to authorities). Viewing the record in the light most favorable to the State, we find substantial evidence that Robert did not reasonably believe that force was necessary to stave off an attack from the visitors.

And even if Robert's belief was reasonable, he unleashed unreasonable force under the circumstances. On appeal, Robert contends that "[r]easonably believing that he and his family were under fire, [he] lawfully exercised his right to use deadly force in self-defense." He insists that firing thirty rounds toward an unarmed and fleeing victim was not excessive and that "the momentary pause" before he opened fire with a different weapon did not change the calculus. We disagree. Robert's response to Jerrel's "loitering" on his law was disproportionate by any measure. First, by his use of a gun. *See Howard*, 14 N.W.2d at 768 ("Iowa's justification defense does not authorize citizens to use a gun in a fistfight."). What's more, a reasonable jury could reject his claim that Stephanie moving her vehicle meant that the threat had not ended and he was compelled to keep shooting. *See State v. Heckethorn*, No. 20-0243, 2021 WL 3392802, at *3 (Iowa Ct. App. Aug. 4, 2021) (noting jury was free to find that defendant used unreasonable force by aiming and shooting the gun at victim through the front of

his house and by shooting another victim who was also unarmed). We find sufficient evidence in the record to show the State met its burden to disprove Heckethorn's defense of justification, and we affirm on this issue.

## 2. Did the State offer sufficient evidence of aiding and abetting?

In his second sufficiency challenge, Robert urges that the State failed to offer substantial evidence to support its aiding-and-abetting theory. He points to the lack of proof that he encouraged either Alcorn or Rebecca to fire their weapons, highlighting the fact that he was outside the house when Alcorn fired the first shots. The State responds that it prosecuted Robert under two theories of criminal liability—both as a principal and as an aider and abettor—and his conviction can be affirmed on either. On the second theory, the State maintains that Robert "knowingly approved and agreed to the offenses because he participated in and encouraged each one."

Our analysis starts with the aiding-and-abetting statute.

> All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals. The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part the person had in it, and does not depend upon the degree of another person's guilt.

Iowa Code § 703.1.

We may uphold a conviction on an aiding-and-abetting theory if the record includes substantial evidence that "the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000). While knowledge of criminal activity is crucial,

neither knowledge nor presence at the scene is enough—standing alone—to prove aiding and abetting.  *Id*.  But we will consider Robert's "presence, companionship, and conduct" before and after the commission of these offenses to decide whether the State offered substantial evidence of aiding and abetting.  *See id*.  (finding such evidence is "enough to infer a defendant's participation in the crime").

To undermine the State's aiding-and-abetting theory, Robert quotes testimony from Des Moines police officer Chase Lohnes, the lead detective.  On cross-examination, counsel asked the detective: "What evidence did you uncover that suggested John Alcorn, Ms. Lyons and Mr. Lyons got together and said, 'Here's what we're going to do.  We're going to take these guys out.'"  Detective Lohnes replied: "There is no evidence of that."  The detective added, "There's no evidence to indicate that all three agreed upon anything."

But as the State notes, "[t]he detective is not the factfinder, and he is not all-knowing either."  And while the record contained no direct evidence of an express agreement among the defendants, a wealth of circumstantial evidence justified finding Robert was liable as an aider and abettor.  *See State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (finding substantial evidence from which jurors could reasonably infer that Lewis aided and abetted the drive-by shooting).  We echo the State's observation that Robert "played a special role in orchestrating the household toward its violent overreaction."  The record reveals that Robert rounded up an array of weapons, loaded them, and made them accessible throughout the house.  That array included the revolver that Alcorn used to launch the shooting spree.  A reasonable juror could find that Robert encouraged Alcorn's conduct by furnishing the revolver.  *See State v. Speaks*, 576 N.W.2d 629, 632

(Iowa Ct. App. 1998) (noting gun used to shoot victim "belonged to" aider and abettor in determining sufficiency of evidence to support murder conviction).

Robert's conduct after the shooting also supported aiding-and-abetting liability. Robert joined Alcorn in misleading the police by insisting that the visitors shot first and Alcorn, Robert, and Rebecca returned fire. *See State v. Neiderbach*, 837 N.W.2d 180, 211 (Iowa 2013) (approving aiding-and-abetting instruction when defendants were both present when the offense was committed and "colluded with each other" to explain what happened).

Viewing the evidence in the light most favorable to the State, we find substantial evidence to support Robert's guilt as an aider and abettor.[7]

## B. Did the district court rule on the weight of the evidence?

Robert seeks a new trial, contending the jury's verdicts were against the greater weight of the evidence. *See State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998). Before reaching the merits of his claim, we must consider whether error was preserved.[8] After the jury found him guilty, Robert moved for a new trial, alleging that the verdicts were contrary to the weight of the evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(7). But the district court did not rule on the weight-of-the-evidence question. Rather, it discussed the sufficiency of the evidence.

> With respect to sufficiency of the evidence, there was a great deal of evidence in the case, including the testimony from the defendants. Although that evidence may have been contradictory, the court does not re-evaluate the evidence and simply considers whether there is sufficient evidence to support the jury's verdict.

---

[7] Robert does not contest any specific elements of attempted murder or willful injury causing serious injury.

[8] We recognize that the State does not dispute error preservation in this case. But we may raise error preservation on our own accord. *See Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000).

This is not a case where the defendant is asking for a remand for the district court to apply the correct standard. *Cf. State v. Root*, 801 N.W.2d 29, 30 (Iowa Ct. App. 2011) ("Root appeals and asserts the district court applied the wrong standard in ruling on his motion for a new trial."). Robert does not recognize that the district court applied the wrong standard. Rather, he asks us to find that the district court abused its discretion and remand for a new trial. But we have nothing to review. The district court did not decide whether the evidence preponderated heavily against the verdicts. *See State v. Nitcher*, 720 N.W.2d 547, 559–60 (Iowa 2006) (requiring independent evaluation of the evidence and determination of witness credibility). And our review does not extend to "the underlying question of whether the verdict is against the weight of the evidence." *State v. Ary*, 877 N.W.2d 686, 707 (Iowa 2016). On this record, we cannot consider the merits of Robert's weight-of-the-evidence challenge. *See State v. Parker*, No. 22-0491, 2023 WL 7391664, at *3 (Iowa Ct. App. Nov. 8, 2023) (finding error was not preserved when defendant did not receive a ruling on his weight-of-the-evidence challenge).

**AFFIRMED.**